2019 IL App (1st) 152112
No. 1-15-2112
Opinion filed August 29, 2019

Fourth Division

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 6126 |
| | ) | |
| JAMES UTLEY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Thomas P. Fecarotta, Jr., |
| | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Justice Gordon dissented, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant James Utley was convicted of possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. He was sentenced as a habitual criminal to respective concurrent terms of mandatory natural life imprisonment without the possibility of parole, 20 years' imprisonment, and 5 years' imprisonment.

¶ 2    In this appeal, defendant claims, first, that section 5-4.5-95(a) of the Unified Code of Corrections (commonly known as the Habitual Criminal Act) (730 ILCS 5/5-4.5-95(a) (West

2014)), as applied to him, violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment of the United States Constitution (U.S. Const., amend. VIII). Second, defendant claims that his trial counsel rendered ineffective assistance of counsel.

¶ 3   The record shows that Jack Tweedle, a senior parole agent with the Illinois Department of Corrections (IDOC), testified at trial that on February 28, 2014, at 6:30 a.m., he arrived with other officers at a home in Streamwood, Illinois, to serve a parole violation arrest warrant and perform a parole compliance check on defendant. After Tweedle knocked on the door for approximately five minutes, defendant answered the door in a T-shirt and boxer underwear. After Tweedle identified himself as an Illinois parole agent, defendant invited him in. Tweedle's partner, Lou Hopkins, entered behind Tweedle. Tweedle explained to defendant that he was there to serve a parole violation warrant and that he had "information that [defendant] was lying about where he lived." Defendant responded "[s]omething to the effect that the parole violation warrant couldn't be an issue because here I am" and stated that he lived at that address. On cross-examination, Tweedle testified initially that he put in his report the fact that defendant had stated that he lived at the Streamwood address. Upon reviewing the report, however, Tweedle conceded that the report did not contain this information.

¶ 4   Michael Ziegler, the commander of the special operations unit of the Streamwood Police Department, testified that, after speaking with defendant's wife, Turquoise Brown, he went to the master bedroom to conduct a search. The north closet in the bedroom contained "a large amount of men's clothing," as well as men's deodorant, men's cologne, and prescription bottles with defendant's name on them. While looking in the closet, Ziegler noticed the strong odor of cannabis. He discovered a small plastic cooler "at the bottom of the closet right by a bunch of

men's shoes." Upon opening the cooler, Ziegler observed that it contained "two scales, a white chunky substance which in [his] training and experience appeared to be cocaine, *** packing materials and scissors." The cooler also contained a box that "appeared to be like for [*sic*] brake pads for a car," and inside the box were "three or four Baggies with a white powdery substance" that Ziegler believed, based on his experience, to be cocaine. The cooler also contained "a box of Baggies" and "the remnants of corners of Baggies." One of the two scales was a small scale "used to measure in grams and other increments," and it "appeared to have a white powdery substance on top" of it. Based on his decades of experience of having made hundreds of narcotics arrests, Ziegler believed that these items were "indicative of [the] sale of narcotics." Continuing his search of the closet, Ziegler also found a plastic container with a plastic bag containing a green leafy substance that emitted a strong odor of cannabis.

¶ 5    Ziegler testified that, after discovering what he believed to be narcotics, he asked defendant's wife "if there was anything else in the house, possible narcotics or contraband that we needed to know about," and she directed him to the south closet in the master bedroom and specifically to a "blue and yellow hat bag." The bag contained a small, black 9-millimeter semiautomatic Beretta pistol, a black .38-caliber revolver with a wooden handle, and various types of ammunition including both 9-millimeter and .38-caliber ammunition.

¶ 6    On cross-examination, Ziegler testified that defendant was wearing a T-shirt and black athletic shorts. Ziegler also testified that he did not take a photo of the prescription bottle and did not know whether the bottle was taken for evidentiary purposes. He stated that he did not know the size of the men's clothing in the north closet and that the south closet contained what "appeared to be ladies['] clothing." Ziegler further testified that the guns were unloaded and that defendant remained in the living room during the search.

¶ 7    Kenya Clark, a senior parole agent with IDOC, testified that she searched the dresser in the master bedroom and found $1000 in cash and a wallet in a drawer containing men's underwear. Clark testified that the wallet "had the parolee's ID in it and had some other cash." However, Clark was not asked what she meant by "the parolee's ID." On top of the dresser, Clark also recovered a checkbook. Clark also observed a bank statement, for January 9, 2014, to February 18, 2014, on a computer table in the living room. Clark testified that the checks and the bank statement bore the names of defendant and his wife, as well as the Streamwood address. Clark further testified that she found defendant's Social Security card in a wooden container with a checkbook; however, she did not specify where she found the wooden container.

¶ 8    Claudio Mercado, a detective with the Streamwood Police Department, testified that he photographed the items that were recovered from the Streamwood residence, most of which had been moved prior to his photographing them, and "collect[ed] the evidence as an evidence technician." When defendant was taken into custody, the officers discussed with defendant what medications he needed, and two prescription bottles were kept by his wife, and one bottle the officers "kept for him to take into County." At the police station, Mercado and Sergeant Darryl Syre spoke with defendant in an interview room, at 10:40 a.m. on February 28, 2014. At that time, defendant told them that he did not want to speak with them, and they left. At 11:50 a.m., they returned to bring him lunch, and he stated then that he wanted to speak with them. Mercado and Syre returned a half-hour later and advised him of his *Miranda* rights, which he indicated he understood. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant was not handcuffed. Mercado testified as follows about defendant's oral statement:

"Q. And what did the defendant tell you in this conversation?

A. Well, he stated that his wife, you know, wasn't aware of the guns or the drugs but he admitted that the drugs were his, the guns were his. He said he, you know, the money that we found was not part of the drugs. He said his wife wasn't aware of any, you know, of that and he also said the cannabis that we found was—it was just for personal use.

Q. Did he indicate what he did with the other drugs?

A. The other drugs he said that he sold them in ounce units and he sold them to other people so that they could go on and sell them for him."

¶ 9    After defendant made this oral statement, Mercado offered to memorialize it in writing, and defendant agreed. Mercado exited the room to type it and returned to show defendant the typed statement. Mercado informed defendant that he could make any changes, additions, or deletions and handed the statement to defendant. After Mercado read it out loud, defendant confirmed that the statement was true and correct, and he signed it at 1:49 p.m., as did Mercado and Syre. After defendant signed the statement, Mercado showed him photos of the guns, ammunition, drugs, and money that were seized, and defendant signed each photo. In addition, defendant made a notation stating: "Money not part of drugs."

¶ 10   In the typed statement, which was admitted into evidence, defendant stated that he lived at the Streamwood home with his wife and family, that his wife did not know anything about the drugs or guns in the home, and that he kept the guns only "for safety reasons," because "he is an ex-gang member and dangerous people are after him." Defendant stated that the cocaine and heroin in the home were his and that he dealt drugs to help support his family. The marijuana was also his, but only for personal use.

¶ 11    On cross-examination, Mercado testified that, after evidence had already been found during the search, Ziegler asked Mercado for a consent to search form, which Mercado gave him. Ziegler then asked defendant's wife to sign it, and she did. Mercado testified that he did not photograph the bank statement as it was lying on the computer table and did not photograph any prescription bottles with defendant's name on them. Mercado also never observed a wallet. Mercado testified that the hat box, which contained the guns and ammunition, also contained women's hats. When Mercado photographed the small wooden box containing defendant's Social Security card and a checkbook, the box was already on the bed in the master bedroom. Mercado opened the lid of the box to photograph its contents.

¶ 12    Mercado testified that, about a half-hour after the police arrived, defendant was already out of the Streamwood home. Defendant's wife contacted a neighbor or family member to take care of the children, and defendant's wife was then transported to the police station. At some point, defendant's personal property, including a wallet[1] and two prescription bottles, were returned to defendant's wife. Before returning the two prescription bottles, Mercado had a conversation with defendant about what medication defendant needed, and the police kept one bottle of penicillin that defendant indicated he needed to take.

¶ 13    Mercado testified that he spoke with defendant's wife at the police station, prior to speaking to defendant at 10:40 a.m. Mercado denied telling defendant that, if he did not admit that the guns and drugs were his, they were going to charge his wife.

¶ 14    After Mercado's testimony, the parties entered a stipulation that stated that, if called, Soretta Patton, a forensic chemist, would testify that she received "three items of a rock-like substance from three separate plastic bags" and that the contents of the bags tested positive for

---

[1]Mercado had previously testified that he had not observed a wallet. That earlier reference appears to be a reference to the wallet found in the dresser in the master bedroom.

cocaine and weighed 78.7 grams. She would further testify that she received another substance that tested positive for heroin and weighed 27.6 grams.

¶ 15     The State then offered into evidence certified copies of defendant's convictions for aggravated battery with a firearm and for unlawful delivery of a controlled substance, which were admitted without objection. After the State rested, defendant moved for a directed finding, which was denied.

¶ 16     Defendant then called Jeffrey Bailey, a senior parole agent with IDOC, who testified that he had supervised defendant's parole, which required Bailey to meet with defendant at least once a month at home and ensure that defendant was in compliance with his parole. Defendant reported that he was living at an address in Schaumburg, and Bailey visited him at that address. During a visit on February 19, 2014, Bailey checked to make sure that defendant had personal property at the Schaumburg address. Primarily, Bailey looks for clothing, and Bailey observed men's clothing in the closet. The visit lasted 5 or 10 minutes, and no one else was present besides Bailey and defendant.

¶ 17     On cross-examination, Bailey stated that every time he visited defendant, Bailey made an appointment with defendant prior to the visit, because defendant lived in an apartment building with a security door. As a result, Bailey had to telephone defendant first to inform him that Bailey was coming, so that defendant could let him in. When Bailey arrived on February 19, 2014, Bailey observed the room in which defendant told him that defendant slept and noticed that the mattress was lying against the wall rather than on the floor. The mattress had no sheets or bedding, and the room did not have a closet or any personal items. However, defendant showed Bailey a closet in the hall that contained men's clothing. Bailey was aware that another adult male also lived in the apartment, but Bailey did not ask defendant to put on the clothes in

the closet. Based on his experience as a parole officer, Bailey testified that normally a parolee is not notified in advance when he is going to be served with an arrest warrant. On redirect examination, Bailey testified that defendant's room in Schaumburg was "a very small room." Bailey further testified that he did not conclude based on the February 19, 2014, visit that defendant did not live there.

¶ 18    Defendant, who was 38 years old at the time of his testimony, testified that on February 28, 2014, at 10:30 a.m. he was in an interview room in the Streamwood police station when Detective Mercado and Sergeant Syre entered and defendant informed them that he did not want to speak to them and requested an attorney. The two officers then left. Defendant remained in the interview room for approximately two hours, before Mercado and Syre returned. Mercado told defendant, "I don't have time for this s***." Defendant repeated that he wanted an attorney and that he had "nothing to say." Mercado responded that he did not have time for this and that defendant was "going to sign a statement" or they were going to charge Brown and that defendant's children would go "to DCFS," the Department of Children and Family Services. Mercado told him that they were going to take the children because "someone needs to be charged." Defendant told him that he "still" had "no knowledge." Mercado then instructed Syre to "call DCFS," and when they started to exit, defendant "broke down" and told them that he would "sign whatever they wanted [him] to sign."

¶ 19    Defendant testified that he had three children, currently aged 14, 13, and 8. The officers told him either he was "going to take ownership of everything or [his] kids are gone and they would charge" Brown, who they were holding in the next room. After defendant told them that he would sign whatever they wanted, the officers left the room and returned a couple of hours later with a statement for him to sign. There was no clock, and the room was dark, so defendant

did not know the exact time this occurred. When the officers returned, they read him his *Miranda* rights from a form, which they had him sign. Then they presented him with a typed statement consisting of two pieces of paper and some photos. The officers did not read the statement to him, and when defendant looked like he was going to glance at the statement, Mercado repeated that he did not have time for defendant to read it. The officers did not give defendant the opportunity to read it or to make any changes, corrections, or deletions. After defendant signed the statement, they had him initial the photos and write on one of the photos that the money was not related to the drugs. The officers explained that if he "admit[ted] to it," they would give the money to Brown for his children, which they never did. Defendant testified that he "would write anything to protect [his] kids." While defendant was in the interview room, he did not receive anything to eat or drink, and he was not allowed to leave for a bathroom break. Defendant was allowed to use the bathroom only later that evening, when he was placed in a cell.

¶ 20    On cross-examination, defendant testified that around 6:15 a.m. on February 28, 2014, he went to Brown's house in Streamwood to pick up his son and take him to school. He and his wife had been married on August 17, 2013, but had separated two months later. Defendant stated that he did not live at Brown's house and did not sleep in her bed that night. Defendant testified that he lived in the two-bedroom Schaumburg apartment with his sister and the mattress was up against the window because he had just shampooed the carpet. Defendant explained that he lived in the two-bedroom Schaumburg apartment with his sister rather than his wife's home in Streamwood "[b]ecause a parolee cannot parole to public housing." Defendant admitted that he had a joint account with his wife at the Streamwood address. As for the Social Security card, defendant testified that it was in his wallet when he was arrested and it was removed from his wallet. Defendant testified that nothing in the typed statement was true, that the officers made it

all up, that he was a business owner,[2] and that the business was how he supported his family. When asked by the assistant state's attorney whether he had been previously convicted of delivery of a controlled substance and if defendant was on parole for that offense, defendant answered affirmatively. He denied that he possessed any guns or drugs at either Brown's Streamwood home or at his Schaumburg apartment.

¶ 21    After defendant finished testifying, the defense rested, and the State called Darryl Syre in rebuttal. Syre testified that he was currently the administrative commander of the Streamwood Police Department but that on February 28, 2014, he was a sergeant. On February 28, 2014, at 10:40 a.m., he and Detective Mercado spoke with defendant in an interview room at the police station. Defendant was handcuffed. At that time, defendant did not tell them that he wanted an attorney or that he was not going to speak with them. At 11:30 a.m., the officers returned to bring defendant lunch, and defendant told them he wanted to talk to them. After defendant finished his lunch, the officers returned, and Detective Mercado read defendant his *Miranda* rights, which defendant acknowledged by initialing each right and signing the form. Syre testified that Mercado did not say that he had no time for "this s***." He also denied that Mercado threatened to take defendant's kids away, to call DCFS, or to charge defendant's wife. Syre was in the interview room the entire time that Detective Mercado was there.

¶ 22    Syre testified that defendant made an oral statement that the drugs and guns were his, that he sold the cocaine by the ounce for $1200, and that the guns were for his protection because he was an ex-gang member. After defendant made this oral statement, the officers exited the room, and Detective Mercado typed up the statement, and they returned. Mercado read the statement out loud, and defendant signed it. Defendant was allowed to make changes, but he chose not to.

---

[2]The presentence investigation report indicated that defendant and his wife owned and operated a cleaning company, which specialized in commercial and janitorial cleaning services, with an income of $5000 per month.

No threats were made, and they did not promise to give the thousand dollars to defendant's family if defendant confessed.

¶ 23    On cross-examination, Syre testified that at 10:40 a.m. on February 28, 2014, defendant's wife was also at the police station. After Syre's testimony, the State rested its rebuttal case.

¶ 24    After listening to jury instructions and closing arguments by counsel, the jury convicted defendant of all charges, namely three counts of unlawful possession of a weapon by a felon, based on the three different types of ammunition found in the hat bag; two counts of possession of a controlled substance with intent to deliver, based on the cocaine and heroin seized from the closet; and two counts of being an armed habitual criminal, based on the pistol and the revolver also found in the hat bag. After the verdict was announced, the trial court merged a number of the counts, leaving one count of unlawful possession of a weapon, one count of possession of a controlled substance, and one count of armed habitual criminal.

¶ 25    On June 11, 2015, the trial court considered and denied defendant's posttrial motion for a new trial. The trial court observed that the State had not filed a petition seeking to have defendant sentenced as a habitual criminal under the Habitual Criminal Act, which provides that, after a verdict, plea, or finding of guilt, the prosecutor "may" file with the trial court "a verified written statement signed by the State's Attorney" setting forth the relevant prior convictions. 730 ILCS 5/5-4.5-95(a)(6) (West 2014). The State then indicated that it intended to file a petition.

¶ 26    On June 26, 2015, the State filed a petition seeking the imposition of a sentence of natural life imprisonment based on defendant's convictions for two prior Class X felonies.

¶ 27    At the sentencing hearing on June 29, 2015, the trial court observed that it had "required the State" to file the petition for natural life "in writing," observing that, although defendant knew about it, "it still formally should have been done." The court then confirmed that defendant

was not contesting the two prior felony convictions cited by the State. In aggravation, the State called Bruce Steinke, an investigator with the Cook County Sheriff's Department, who testified that, on May 7, 2015, he was assigned the task of locating defendant, who had disappeared prior to jury deliberations. In an attempt to execute an arrest warrant for defendant, Steinke and other officers went to several addresses, including one in Bartlett, Illinois, where he observed a vehicle belonging to defendant's wife in the driveway. At 9:48 p.m., he checked the hood of the vehicle and found it was still warm. Over the course of 10 minutes, Steinke rang the doorbell and knocked on the door several times.

¶ 28    Steinke testified that the officers placed a couple of police squad vehicles in front of the house with the emergency lights on and shined a spotlight at the upstairs windows, which were open. Another officer shouted at the open windows that the officers wanted to take defendant peacefully. After 10 minutes of shouting and spotlights, defendant responded: "okay, okay, I'll be coming out. I want to say goodbye to my family. My son is going to be walking me out the front door." After that, defendant exited the door with his son and smoking a cigarette. Defendant gave his son a hug, and the officers let him finish his cigarette and then arrested him.

¶ 29    Steinke testified that another officer informed defendant of his *Miranda* rights and then Steinke and two other officers transported defendant to the police station. During the ride to the station, Steinke sat next to defendant. Steinke testified that defendant stated that, "if we had located him earlier in the day, that things wouldn't have gone as easy as they did, that he would have tried to attempt to take several of us with him." He further stated "that he wouldn't have come out if his family hadn't been in there, that he would [have] made us wait for a long time, he wasn't going to exit the building." Further, defendant "made a claim that he had to go to Indiana to pursue some personal matters earlier in the day and that he felt that on his way there, he

wanted to do harm to any innocent individuals that would get in his way because he—he just wasn't in the right state of mind."

¶ 30    On cross-examination, Steinke testified that, despite defendant's words, he exited the house peacefully, let himself be handcuffed without incident, allowed the officers to walk him to their vehicle without a struggle, and entered the vehicle without objection. Steinke agreed that, "[a]s far as his actions physically with [the officers], he was nothing but a gentleman."

¶ 31    The State had no further evidence in aggravation, and defense counsel stated that the defense had no additional evidence in mitigation to present. The presentence investigation report (PSI) indicated that defendant was placed in a special education program in grade school, that he was transferred to a specialized school, and that he eventually obtained a general educational development certificate (GED). Defendant's mother was an alcoholic and physically abusive, leaving defendant with permanent scars. Prior to incarceration for this offense, defendant and his wife were the owners and operators of a cleaning company, which they founded in 2012 and which specialized in commercial and janitorial cleaning services, providing them an income of $5000 per month. Defendant and his wife originally married in 2005 and then divorced when defendant was incarcerated for a prior offense, before reuniting in 2012 after his release.

¶ 32    Defense counsel argued that, although the law required a mandatory life sentence, the punishment did not fit the crime.

¶ 33    After considering factors in aggravation and mitigation and noting defendant's "significant criminal history," the trial court stated:

> "The Court takes no pleasure in sentencing the defendant to natural life
> imprisonment; however, it's mandated by statute, and the Court has an obligation

to follow the law. He is a young man, and he will spend the rest of his life in prison unless the law changes and it's held to be retroactive."

The trial court then sentenced defendant as follows: (1) for possession of a controlled substance, to natural life in prison without parole; (2) for being an armed habitual criminal to 20 years with IDOC, to be served concurrently with the natural life sentence; and (3) for unlawful use of a weapon by a felon, to 5 years, also to be served concurrently with the natural life sentence. The trial court did not state whether the determinate sentences were concurrent with each other. However, the mittimus states that these sentences also run concurrently. On July 14, 2015, defendant filed a timely notice of appeal, and this appeal followed.

¶ 34    In this appeal, defendant claims, first, that the Habitual Criminal Act, as applied to him, violates the proportionate penalties clause of the Illinois Constitution and the eighth amendment of the United States Constitution. Second, defendant claims that his trial counsel rendered ineffective assistance of counsel. Our supreme court has held that "a court of review should consider the constitutionality of a statute as a matter of last resort, only after the resolution of any other nonconstitutional and constitutional grounds for disposing of the case" (*People v. Carpenter*, 228 Ill. 2d 250, 264 (2008)), and, accordingly, we will address the narrower issue of defendant's ineffectiveness claims first.

¶ 35    Defendant first claims that his trial counsel provided ineffective assistance because trial counsel failed to move to sever the gun charges from the drug charges. Defendant's second ground for claiming ineffective assistance of counsel is that counsel should not have withdrawn defendant's motion to suppress his statement to the police.

¶ 36    Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois Constitution. U.S.

Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Domagala*, 2013 IL 113688, ¶ 36. Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland* for Illinois)). To prevail on a claim of ineffective assistance, a defendant must show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *Id.* (citing *Strickland*, 466 U.S. at 687).

¶ 37 Since a trial court is typically not asked to rule on whether trial counsel was ineffective, an appellate court generally reviews claims of ineffective assistance *de novo*. See *People v. Reveles-Cordova*, 2019 IL App (3d) 160418, ¶ 43; *People v. Jamison*, 2018 IL App (1st) 160409, ¶ 40. *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *People v. Walker*, 2018 IL App (1st) 160509, ¶ 22.

¶ 38 To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36.

¶ 39 Here, defendant notes that he was charged with being an armed habitual criminal, with unlawful use of a weapon by a felon for his alleged possession of guns and ammunition, and with possession of a controlled substance with intent to deliver for his alleged possession of cocaine and heroin. Defendant further notes that, to prove the gun charges, the State was required to introduce evidence of defendant's prior convictions for aggravated battery with a firearm and delivery of a controlled substance, neither of which would have been admissible to prove the possession of a controlled substance offense. Defendant contends that, in these circumstances,

defense counsel should have filed a motion to sever the gun charges and drug charges and that, had counsel done so, the court would have granted the motion.

¶ 40    Pursuant to section 111-4(a) of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/111-4(a) (West 2014)):

> "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction."

However, under section 114-8 of the Procedure Code (*id.* § 114-8(a)):

> "If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require."

"The trial court is entitled to substantial discretion when deciding whether to sever charges, and that discretion is to be exercised so as to prevent injustice," and the decision to sever or not turns on the particular facts of each case. *People v. Patterson*, 245 Ill. App. 3d 586, 588 (1993).

¶ 41    In *People v. Edwards*, 63 Ill. 2d 134, 136 (1976), our supreme court articulated the importance of severing charges in appropriate circumstances, ultimately reversing the trial court's denial of the defendant's motion to sever. The defendant in *Edwards*'s three-count indictment charged him with one count of armed robbery and two counts of unlawful use of weapons. The unlawful use of a weapon charge alleged in count II of the indictment was a Class A misdemeanor. The unlawful use of a weapon charge alleged in count III was a Class 3 felony because the defendant had a prior felony burglary conviction. *Id.* at 136. The defendant moved to

sever count III from the other charges because he would be prejudiced by the State's introduction of evidence regarding his prior burglary conviction. *Id.* at 137. The appellate court found the trial court abused its discretion in not granting the defendant's motion for severance, and our supreme court agreed, stating:

> "We share the appellate court's concern that the procedure used in this case involves a significant risk that the trier of fact will use evidence of a prior conviction in determining the defendant's guilt or innocence of an unrelated offense. The procedure could have easily been avoided in the instant case. The State does have an interest in its pursuit of judicial economy in prosecuting all charges against one defendant in one trial, but that interest is not so strong as to justify the denial of a severance in the instant case. We find that the joinder of the armed robbery and the felonious unlawful use of a weapon charges created such a strong possibility that the defendant would be prejudiced in his defense of the armed robbery charge that it was an abuse of the trial court's discretion to deny a severance." *Id.* at 139-40.

¶ 42    Similarly here, we find that there existed a significant risk that the jury's knowledge that defendant had previously been convicted of aggravated battery with a firearm and unlawful delivery of a controlled substance would be used in determining his guilt or innocence of the instant, unrelated, offense. See *People v. Bracey*, 52 Ill. App. 3d 266, 273 (1977) ("Evidence which directly, or by inference, tends to show that the accused has committed another criminal offense is inadmissible where its only value is to create an inference that because an individual has committed other crimes he is more likely to have committed the one for which he is on trial.

[Citations.] Where such evidence has been revealed to a jury, even if for lawful reasons, the danger arises that the jury will infer a criminal propensity from those convictions.").

¶ 43    The State, however, contends that defense counsel's decision not to move to sever the charges should be seen as trial strategy. The State relies on *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 24, in which this court stated, "Generally, a defense decision not to seek a severance, although it may prove unwise in hindsight, is regarded as a matter of trial strategy."

¶ 44    In *Fields*, this court rejected the defendant's claim of ineffective assistance of counsel based on counsel's failure to file a motion to sever his armed habitual criminal and armed robbery charges. However, in *Fields*, there was evidence in the trial record that supported a conclusion that defense counsel's decision was intentional and strategic. Specifically, defense counsel had filed a motion *in limine* seeking to bar admission of the defendant's prior convictions for armed robbery and unlawful use of a weapon by a felon, arguing that the similarity of the prior convictions to the armed robbery charge rendered the evidence unfairly prejudicial. *Id.* ¶ 4. The trial judge in *Fields* granted defense counsel's motion and asked how defense counsel "intended to handle" the armed habitual criminal charge. *Id.* Counsel responded that the defense would agree to stipulate to the fact that the defendant had two qualifying prior convictions, without specifying the exact nature of those convictions. *Id.*

¶ 45    On appeal, this court rejected the defendant's claim that counsel was ineffective for failing to file a motion to sever, finding that defendant had not overcome the presumption that counsel's action or inaction was strategic. *Id.* ¶ 28. However, in so holding, the court stated:

> "The fact that defense counsel moved to bar admission of the prior convictions
> demonstrates an awareness of the prejudice Fields would suffer from a jury
> hearing about them in the armed robbery case. Additionally, the fact that the trial

18

judge granted the motion shows that the trial judge recognized the convictions were sufficiently prejudicial to deny Fields a fair trial." *Id.* ¶ 27.

¶ 46    This court then concluded:

"while an 'all or nothing' strategy required exposing the jury hearing the armed robbery charge to prejudicial information it would not have heard if the cases had been severed, the stipulation to the mere fact of the conviction mitigated the prejudice to defendant, when compared to the specific offenses heard by the jury in *Edwards*. [Citation.] Here, defense counsel may have believed that the odds of getting two acquittals were greater in one proceeding, rather than two proceedings." *Id.* ¶ 28.

¶ 47    Accordingly, this court concluded that the defendant did not overcome the strong presumption that the counsel's "action or inaction might have been the product of sound trial strategy." (Internal quotation marks omitted.) *Id.*

¶ 48    In this case, unlike in *Fields*, we conclude that defense counsel's failure to move to sever the charges was objectively unreasonable under prevailing professional norms. The State does not identify any particular "strategy" that was served by a decision not to move to sever in this particular case, and we find nothing in the trial record to suggest that defense counsel made a strategic decision to not file a motion to sever. In *Fields*, the actions taken by defense counsel supported the presumption that counsel's decision not to file a motion to sever was a strategic attempt to pursue a particular "all or nothing" strategy. Unlike counsel in *Fields*, counsel here made no attempt to minimize the prejudice to defendant in lieu of filing a motion to sever, by either filing a motion *in limine* or by offering to stipulate to the fact of defendant's predicate felonies. In these circumstances, we find nothing in the record to reassure this court that

counsel's inaction may have been a matter of sound trial strategy, and we find no reasonable trial strategy that was served by counsel's failure to move to sever the charges.

¶ 49    Such a conclusion is particularly apt here, where defendant was facing a sentence of life imprisonment without the possibility of parole if he were to be convicted of the drug charge. Although defendant had been offered a plea deal prior to trial, pursuant to which he could have pleaded guilty in exchange for a 14-year sentence, defendant rejected that offer, choosing instead to go to trial. In these circumstances, with such dire consequences that would occur upon defendant's conviction, we conclude that counsel was required to take some action to minimize the prejudice to defendant that would arise from the introduction of his prior convictions. Counsel here did not do so.

¶ 50    Having determined that defendant satisfied the first prong of the *Strickland* standard, we now consider the second prong—whether counsel's deficient performance prejudiced the defendant. To establish the second prong, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 51    Defendant argues that the prejudice stemming from this error was twofold: first, that the jury heard about defendant's possession of guns and ammunition as part of the drug case and, second, that the jury also heard, as part of the drug case, about his prior convictions since they were elements of the gun charges, although not elements of the drug charges. As a result,

defendant claims that there is a reasonable probability that he would not have been convicted on the drug charges but for counsel's error.

¶ 52    For many of the same reasons stated above, we also conclude that defendant satisfied the second prong of the *Strickland* standard—that defendant suffered prejudice from counsel's deficient performance. Because the jury heard that defendant had been previously convicted of aggravated battery with a firearm and unlawful delivery of a controlled substance, crimes that involved the same type items of contraband in this case, the jury may have inferred that the contraband at issue here also belonged to defendant, rejecting the defense's version of events. See *Bracey*, 52 Ill. App. 3d at 273.

¶ 53    Moreover, there were a number of discrepancies in the State's case against defendant, which may have been overlooked by the jury based on their knowledge of his prior criminal record. In particular, the record showed that it was Brown, not defendant, who directed the officers to the contraband found in both closets, and the guns were found in a closet containing only women's items. Additionally, as we will discuss further in the next section, there were significant questions surrounding the circumstances of defendant's statement to police. Under the facts here, we find that defendant sufficiently showed prejudice arising from counsel's failure to move to sever the charges and that counsel's failure to do so was ineffective.

¶ 54    Defendant also contends that his trial counsel was ineffective for withdrawing defendant's pretrial motion to suppress his statement. In particular, defendant argues that, without his statement, there was no evidence tying defendant to the guns, as opposed to his wife. In light of the constitutional right to bear arms, particularly in the home, guns in the home are not presumptively illegal, and the State introduced no evidence that possession by defendant's wife was illegal. See U.S. Const., amend. II; *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)

(a law banning handgun possession in the home violated the second amendment). On the evidence before us, the presence of guns and ammunition in the home was illegal only if they belonged to defendant, a convicted felon, and defendant argues that the only evidence that the guns—found in a woman's hat bag, with women's hats, in a closet with only women's clothes and identified there by his wife—was his confession that they were his.

¶ 55     As noted above, to establish the first prong of the *Strickland* test that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. In order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). The decision whether to pursue a motion to suppress is generally considered to be a matter of trial strategy, entitled to great deference. *People v. Bew*, 228 Ill. 2d 122, 128 (2008). However, "[t]o be reasonably effective, criminal defense attorneys must raise constitutional violations when constitutional rights have been violated and move to suppress damning evidence produced in violation of constitutional guarantees." *People v. Miller*, 2013 IL App (1st) 110879, ¶ 72 (citing *People v. Brown*, 358 Ill. App. 3d 580, 593-94 (2005)). To overcome the presumption of trial strategy, "the defendant must demonstrate a reasonable probability that the motion would have been granted and that the outcome of the trial would have been different." *People v. Spann*, 332 Ill. App. 3d 425, 432-33 (2002) (citing *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000)). As noted above, a "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

¶ 56    As an initial matter, the State contends that this court should decline to entertain defendant's claim of ineffective assistance of counsel on this basis because, in a transcript of the hearing in which counsel withdrew the motion to suppress and to quash the arrest warrants, defendant agreed with counsel's decision to withdraw the motions and stated that he understood that he would not be able to refile them. The State contends that defendant cannot "request to proceed in one manner and then later contend on appeal that the course of action was erroneous." We are unpersuaded.

¶ 57    Although a defendant cannot generally allege an error on the part of the trial court when he agreed to, or invited, a particular procedure (see *People v. Harvey*, 211 Ill. 2d 368, 385 (2004)), we have found no authority explicitly precluding a defendant from raising a claim of ineffective assistance of counsel based on defendant's agreement with counsel's actions. To the contrary, two cases from our supreme court have reviewed ineffective assistance claims, while also declining to review the trial court errors arising from counsel's actions. See *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001) (reviewing ineffective assistance claim for defense counsel submitting allegedly improper verdict forms, while finding that the defendant could not directly challenge "the very verdict forms he *requested* at trial" (emphasis in original)); *People v. Segoviano*, 189 Ill. 2d 228, 247-48 (2000) (reviewing ineffective assistance claim for counsel's objection to a mistrial, despite finding that the decision to decline to declare a mistrial was invited). Defendants are generally entitled to rely on the advice of counsel (see *People v. Hall*, 217 Ill. 2d 324, 340 (2005)) and cannot be expected to object to all actions of counsel with which they disagree so as to preserve later potential claims of ineffective assistance. Accordingly, we decline the State's request to dispose of defendant's claim on this basis.

¶ 58 Based on the record in this case, we conclude that defendant has rebutted the presumption that counsel's decision not to file a motion to suppress was proper. Had counsel not withdrawn the motion to suppress, there is a reasonable probability that it would have been granted.

¶ 59 "Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving the confession was voluntary by a preponderance of the evidence." *People v. Braggs*, 209 Ill. 2d 492, 505 (2003) (citing 725 ILCS 5/114-11(d) (West 2000)). "The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *Id.* To protect an individual's right not to be a witness against himself, found in both the United States and Illinois Constitutions (see U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10), interrogation must cease once the individual indicates in any manner and at any time prior to or during a custodial interrogation that he wishes to remain silent. *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005) (citing *People v. Edwards*, 301 Ill. App. 3d 966, 977 (1998); *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)). " '[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.' " *Id.* (quoting *Miranda*, 384 U.S. at 474).

¶ 60 Moreover, if a suspect "asserts his right to counsel, the interrogation must cease 'until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.' " *People v. Outlaw*, 388 Ill. App. 3d 1072, 1079 (2009) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). "If the police initiate an encounter with a suspect who has requested counsel and has not had counsel made available to him, any statements made by the suspect are deemed involuntary and inadmissible as substantive evidence at trial." *Id.* at 1079-80 (citing *People v. Winsett*, 153 Ill. 2d 335, 349

(1992)). Where a suspect has made statements after invoking his right to counsel, "the prosecution may not use those statements unless the 'State can establish (1) the *accused* initiated further discussions with the police; *and* (2) that he knowingly and intelligently waived the right he had invoked.' " (Emphases in original.) *Id.* at 1080 (quoting *Winsett*, 153 Ill. 2d at 350).

¶ 61    In this case, defendant presented evidence at trial that he told Mercado and Syre that he did not want to talk to them and that he wanted to speak to an attorney. Defendant also provided testimony that the officers threatened to charge Brown and send defendant's children to DCFS if defendant did not confess and offered to give money to Brown to benefit defendant's children if he complied. Mercado's testimony also supported the fact that defendant told them that he did not want to talk to them, although he claimed that defendant later changed his mind after they brought him lunch.[3] We also note that defendant's statement was not recorded and that defendant claimed he was forced to sign the statement, prepared by Mercado, without being able to review or make changes to it.

¶ 62    Additionally, defendant's statement is questionable because it contradicts the evidence and testimony provided by the officers at trial. Specifically, in his statement, defendant claimed full responsibility for the contraband and maintained that Brown did not know about the items. However, the testimony from the officers established that it was Brown who first directed them to the closet containing drugs and later to the closet containing the guns and ammunition. Moreover, although the officers denied threatening to charge Brown, the testimony establishes that Brown was also brought to the police station, which could cause a reasonable finder of fact to believe that the officers were either considering charging her or attempting to use her presence to induce defendant to confess.

---

[3]Syre's testimony was contrary to Mercado's, in that Syre claimed that defendant had not told them he did not want to talk to them. Syre did, however, testify that the detectives did not talk to defendant at that point and instead returned later when they brought him lunch.

¶ 63 There was also a question regarding the timing of defendant's signing of the typewritten statement. Specifically, both pages of the statement were signed at 1:49 p.m. by defendant and both officers. During Mercado's testimony, he testified that defendant would not have signed both pages at the same time but, rather, they would have gone through each page separately. It is unlikely that the officers could have gone through both pages of the statement and had all three individuals sign each page in less than one minute. To the contrary, the time notation on each page of the statement would support defendant's claim that he was forced to sign the statement without reviewing, or being able to make changes to, it.

¶ 64 In these circumstances, there is enough doubt as to the circumstances surrounding defendant's statement for this court to find a reasonable probability that the motion to suppress would have been granted.

¶ 65 Moreover, if defendant's incriminating statements had been suppressed, we find a reasonable probability that the outcome of the trial would have been different. See *Miller*, 2013 IL App (1st) 110879, ¶ 84 ("Even if defense counsel vigorously tests the State's evidence at trial, prejudice can be found where a motion to suppress 'would have been defense counsel's strongest, and most likely wisest, course of action.' " (quoting *People v. Little*, 322 Ill. App. 3d 607, 613 (2001))).

¶ 66 As our supreme court has stated, a "confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable." *People v. R.C.*, 108 Ill. 2d 349, 356 (1985); see also *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988) ("Confessions carry 'extreme probative weight,' and therefore the admission of an unlawfully obtained confession rarely is harmless error.").

¶ 67    In light of defendant's confession here, the defense was impeded in its varying attempts to test the State's evidence at trial. In particular, the defense attempted to introduce reasonable doubt as to defendant's guilt in various ways, including by disputing that he lived at the Streamwood address and by introducing evidence that the evidence was moved or otherwise improperly handled. In addition, the evidence showed that it was Brown who directed the officers to the contraband and, in particular as to the guns and ammunition, they were found in a woman's hat box inside a closet that contained women's clothing.

¶ 68    Although there existed other evidence of defendant's guilt, under the circumstances here we cannot have confidence that defendant's confession did not contribute to his conviction. See *Brown*, 358 Ill. App. 3d at 596 ("The question that needs to be answered now, given the evidence improperly admitted because of counsel's failure, is whether we are confident that the trial's outcome would have been identical to the outcome reached, had counsel performed to the standard that the Constitution demands of professional advocates."); see also *St. Pierre*, 122 Ill. 2d at 114-15. Accordingly, we find that defendant met his burden of showing that counsel rendered ineffective assistance for withdrawing the motion to suppress. See *Miller*, 2013 IL App (1st) 110879, ¶ 84 ("A counsel's failure to suppress damning evidence procured in violation of defendant's constitutional guarantees constitutes ineffective assistance of counsel ***.").

¶ 69    Considering what was at stake in this case, specifically that defendant would be sentenced to life imprisonment without parole if convicted, counsel's best strategy was to attempt to get defendant's statement suppressed. However, counsel here did not do so and instead chose to withdraw a motion providing defendant his best chance of success. The record does not indicate any reason why the motion was withdrawn, and we see no strategy that was

served by its withdrawal. In these circumstances, we conclude that counsel's performance was ineffective.

¶ 70    We note that defendant does not contend that the evidence was insufficient to prove him guilty beyond a reasonable doubt, and after reviewing the record, we conclude that the evidence was sufficient. Accordingly, there is no double jeopardy impediment to a new trial. See *People v. Flores*, 2014 IL App (1st) 121786, ¶ 64. In so finding, however, we reach no conclusion as to defendant's guilt that would be binding on retrial. See *id.* (citing *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008)). Accordingly, we reverse defendant's convictions and remand for a new trial.

¶ 71    Having so held, we need not consider the statutory constitutional issues raised by defendant, namely whether the Habitual Criminal Act violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) or the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), as applied to him.

¶ 72    Reversed and remanded for further proceedings consistent with this order.

¶ 73    JUSTICE GORDON, dissenting:

¶ 74    For the following reasons, I am not persuaded by defendant's claims of ineffective assistance of counsel, and thus, I would affirm his conviction. As a result, I must respectfully dissent from the majority's decision to reverse on that basis. However, I would remand for resentencing as explained below.

¶ 75    In this appeal, defendant claims, first, that the Habitual Criminal Act, as applied to him, violates (1) the proportionate penalties clause of the Illinois Constitution and (2) the eighth amendment of the United States Constitution. Defendant claims, second, that his trial counsel

rendered ineffective assistance of counsel. Like the majority, I will discuss defendant's ineffectiveness claims first.

¶ 76                                     I. Ineffective Assistance of Counsel

¶ 77    Defendant claims that his trial counsel provided ineffective assistance because, first, trial counsel failed to move to sever the gun charges from the drug charges. Defendant argues that the prejudice stemming from this error was twofold: first, that the jury heard about defendant's possession of guns and ammunition as part of the drug case and, second, that the jury also heard, as part of the drug case, about his prior convictions since they were elements of the gun charges. As a result, defendant claims that there is a reasonable probability that he would not have been convicted on the drug charges but for counsel's error.

¶ 78    Defendant's second ground for claiming ineffective assistance of counsel is that counsel should not have withdrawn defendant's motion to suppress his statement to the police.

¶ 79    To prevail on a claim of ineffective assistance, a defendant must show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 80    To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance

rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 81    Although the *Strickland* test is a two-prong test, our analysis may proceed in any order. Since a defendant must satisfy both prongs of the *Strickland* test, a trial court may dismiss the claim if either prong is missing. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Thus, if a court finds that defendant was not prejudiced by the alleged error, it may dismiss on that basis alone without further analysis. *People v. Graham*, 206 Ill. 2d 465, 476 (2003); *People v. Albanese*, 104 Ill. 2d 504, 527 (1984).

¶ 82    "Even if we accept [a] defendant's contention that the trial court would have suppressed his statement," an ineffectiveness claim will still fail if he cannot "demonstrate a reasonable probability that the outcome of the entire trial would have changed, resulting in his acquittal." *People v. Patterson*, 2014 IL 115102, ¶ 83; *People v. Bew*, 228 Ill. 2d 122, 128-29 (2008) (requiring a reasonable probability of different outcomes at both the suppression hearing and the trial).

¶ 83    Where the evidence at trial was "overwhelming," a reviewing court will not be "persuaded that it is reasonably probable that a jury would have acquitted [the] defendant even in the absence" of counsel's alleged errors. *Patterson*, 2014 IL 115102, ¶ 87. If the evidence of defendant's guilt was overwhelming, "[t]he reasonably probable impact of counsel's alleged error is not sufficient to undermine our confidence in the outcome of the trial" and, thus, not sufficient to establish the prejudice prong of the *Strickland* test. *Patterson*, 2014 IL 115102, ¶ 87.

¶ 84    In the case at bar, the evidence on the drug charges was overwhelming, even without the challenged evidence—namely, the guns, ammunition, prior convictions, and confession. Police officers arrived at the Streamwood home at 6:30 a.m. on a freezing cold February day, and

defendant answered the door wearing a T-shirt and shorts. There was no evidence that anyone lived in the home besides defendant, his wife, and his minor children, yet a plethora of narcotics paraphernalia was found. All the narcotics and related equipment was found in a closet evidently belonging to the man of the house. The closet was in the master bedroom and filled with men's clothing, men's shoes, men's cologne, and men's deodorant.

¶ 85    In case there was any doubt whose closet this was, the closet also had a prescription bottle with defendant's name on it. While defense counsel effectively established that the officers failed either to photograph or collect this bottle for evidence, there was other testimony establishing that defendant had several prescription bottles with him at the home when he was arrested, including one for penicillin that he was currently taking.

¶ 86    In addition to his presence at the home in the early morning hours dressed in a T-shirt and shorts in February, defendant's residence at the Streamwood home was further shown by checks and bank statements in his name, both located in the home and bearing its address, and the presence of his wallet and Social Security card, as well as the presence of his wife and children. The bank statement lying on the computer table was for the period from January 9, 2014, to February 18, 2014, ending just 10 days before the search.

¶ 87    Defendant explained why he could not provide the Streamwood home as his official parole address: because a felon cannot be paroled to public housing.[4] Thus, the address he provided his parole officer was his sister's apartment in Schaumburg. However, as his parole officer observed when in that apartment, the bedroom that was reportedly defendant's room had no personal items or even a closet, and the mattress had no sheets or bedding and was up against the wall. Although the closet in the hallway of the Schaumburg apartment had men's clothing, that apartment was also shared by another man. By contrast, the master bedroom in defendant's

---

[4]There is nothing in the record to indicate that the Streamwood home was public housing.

wife's home had a closet filled with men's clothing and shoes, and there was no evidence that another man occupied the home. Between the two residences, the evidence was clear where defendant was living.

¶ 88    Based on his decades of experience of having made hundreds of narcotics arrests, Ziegler testified that the seized items were "indicative of [the] sale of narcotics." There were two scales, including one with a white powdery substance indicating exactly what it was used for. In the cooler with the drugs were materials to use in packaging it, such as Baggies and scissors, and of course, there were the drugs themselves.

¶ 89    Although defendant testified that he and his wife had been separated since October 2013, or almost four months before his arrest in this case, his testimony was belied by his presence in her home in the early morning hours, with his multiple prescriptions, wallet, Social Security card, and joint bank account and dressed in scanty clothes for February. In addition, although the statement was not contained in his report, Tweedle, a parole agent, testified that defendant admitted to living in the Streamwood home shortly after the officers arrived there.

¶ 90    In sum, the evidence on the drug charges was so overwhelming—even without considering the guns, ammunition, prior convictions or confession—that defendant could not have suffered any prejudice from the ineffectiveness alleged on appeal against trial counsel. While the credibility of a witness such as defendant is generally a question for the jury, given the overwhelming physical evidence weighing against defendant's claim of not residing at the Streamwood home, I am not persuaded that the jury would have acquitted him, even in the absence of the evidence that he now challenges through his ineffectiveness claim. See *Patterson*, 2014 IL 115102, ¶ 87.

¶ 91    As for the gun charges, the evidence concerning defendant's residence is the same. However, the guns and ammunition were discovered in a different closet that contained only women's clothing and in a hat bag containing only women's hats, and the police discovered them only after asking defendant's wife if there was any other contraband in the home and she directed them specifically to the women's hat bag. As a result, I cannot say that the evidence concerning defendant's possession of the guns was as overwhelming as the evidence concerning his possession of the narcotics, and I proceed to analyze the first prong of the *Strickland* test, concerning counsel's performance.

¶ 92    With respect to the gun charges, defendant argues that his counsel's performance was deficient for withdrawing defendant's pretrial motion to suppress his statement. In particular, defendant argues that, without his statement, there was no evidence tying defendant to the guns, as opposed to his wife. In light of the constitutional right to bear arms, particularly in the home, guns in the home are not presumptively illegal, and the State introduced no evidence that possession by defendant's wife was illegal. See U.S. Const., amend. II; *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (a law banning handgun possession in the home violated the second amendment). On the evidence before us, the presence of guns and ammunition in the home was illegal only if they belonged to defendant, a convicted felon, and defendant argues that the only evidence that the guns—found in a woman's hat bag, with women's hats, in a closet with only women's clothes, and identified there by his wife—was his confession that they were his.

¶ 93    As noted above, to establish the first prong of the *Strickland* test, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. In order

to establish deficient performance, the defendant must overcome the strong presumption that the challenged action may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Manning*, 241 Ill. 2d at 327. The decision whether to pursue a motion to suppress is generally considered to be a matter of trial strategy, entitled to great deference. *People v. Bew*, 228 Ill. 2d 122, 128 (2008). In addition, while defendant is entitled to effective assistance during plea negotiations (*People v. Hale*, 2013 IL 113140, ¶ 16), the decision of what plea offer to accept or reject belongs solely to defendant and is not a decision that counsel makes. *People v. Manning*, 227 Ill. 2d 403, 416 (2008).

¶ 94    In the case at bar, defendant personally acknowledged his decision to withdraw the motion to suppress, and he did it on the record, with the full knowledge that it could not be refiled. While the majority discusses this fact at length, the record does not stop there. The record further indicates that counsel withdrew the motion in conjunction with plea negotiations with the State and the State's agreement to keep its plea offer open. The record shows that plea negotiations were ongoing for months, continuing right up to the minutes before trial, and that the withdrawal of the suppression motion occurred during the thick of these negotiations. Below I discuss fully the record concerning this issue.

¶ 95    On May 30, 2014, defendant filed a motion to quash arrest and suppress evidence, arguing that the police searched the Streamwood home without either a search warrant or consent to search. On July 7, 2014, the parties appeared for a suppression hearing, but first the parties requested a Rule 402 conference, which was held. See Ill. S. Ct. R. 402 (eff. July 1, 2012. After the conference, defense counsel stated on the record that defendant was "not accepting the offer." The trial court observed that "[a]ll offers" are withdrawn, and the hearing began.

¶ 96    The hearing was continued to July 30, 2014, when defendant informed the trial court that he requested his private attorney to withdraw as counsel. Since the parties were in the middle of a hearing, the trial court denied the motion. At the end of the hearing on September 30, 2014, the trial court denied the suppression motion, and defense counsel renewed his motion to withdraw. Defendant stated that he wanted this withdrawal "a long time ago," and the trial court granted it, appointing the public defender in the prior counsel's place. On November 20, 2014, defendant retained private counsel, and the public defender withdrew. On February 19, 2015, defendant's third counsel filed two motions: (1) a motion to suppress the statements that defendant made at the police station on the ground that defendant had asserted his rights to remain silent and to have an attorney present and (2) a motion to quash the arrest warrant served on February 26, 2014, at the Streamwood home.

¶ 97    On March 20, 2015, the case was set for a hearing on defendant's motions, but the parties asked the trial court again for a Rule 402 conference, which was held. After the Rule 402 conference, the following colloquy occurred on the record:

> "DEFENSE COUNSEL: Good morning. Again, [defense counsel] on behalf of the defendant. Judge I have relayed the 402 conference to my client. At this time, Judge, we would be asking to withdraw the motions. And as we discussed before, Judge, and set the matter for trial.
>
> THE COURT: Are you asking me to hold the offer open?
>
> DEFENSE COUNSEL: That's correct.
>
> THE COURT: All right. And for the record, the motions that you are asking to withdraw are?

DEFENSE COUNSEL: Motion to quash arrest warrants and motion to suppress statements.

THE COURT: State, any objections?

ASSISTANT STATE'S ATTORNEY: No, Judge.

THE COURT: [Defendant], do you want your lawyer to withdraw those motions?

DEFENDANT: Yes.

THE COURT: By doing so you're not able to refile them. Do you understand that?

DEFENDANT: Yes.

THE COURT: Leave to withdraw motion to suppress statements and motion to quash arrest warrants is granted."

¶ 98    To the extent that the withdrawal of the motions was part of the plea offer that defendant was considering and desiring to keep open,[5] that decision belonged to defendant, as the trial court made clear by personally questioning defendant on the record. See *Manning*, 227 Ill. 2d at 327. To the extent that the decision was part of counsel's strategy relating to the plea negotiations, that decision is immune from an ineffectiveness claim. *Manning*, 241 Ill. 2d at 327. Thus, I cannot find that counsel rendered ineffective assistance by withdrawing the motion to suppress.

¶ 99    Defendant appears to limit his argument about the motion to sever to its effect on the drug charges (*supra* ¶ 77), which I discussed above (*supra* ¶¶ 84-90). However, to the extent that defendant argues that the failure to sever also affected the gun charges because the jury then

---

[5]The offer was still apparently open on the eve of trial. On May 4, 2015, the parties held yet another Rule 402 conference, after which the prosecutor stated that the State's offer was 14 years and the defense counsel stated that he had advised his client that he would receive a sentence of natural life if convicted, and defendant stated that he rejected the offer.

learned of the drugs found in the same room as the guns, it is not reasonably probable, even if the motion to sever was granted, that a trial court would have *also* granted a motion to suppress the drugs found in the same room, during the same search, where the presence of drugs could be used to shed light on the possession of the guns. It is well established that drug dealers "need weapons to protect their drugs, [and] cash." *People v. Murray*, 2017 IL App (2d) 150599, ¶ 82; *People v. Neylon*, 327 Ill. App. 3d 300, 311 (2002) ("The drug trade is a cash-and-carry business with a large profit margin and dealers frequently use guns for protection."); see also *People v. Hunter*, 2013 IL 114100, ¶ 27 (simultaneous possession of drugs and guns, "discovered during the same search, at the same place, and at the same time" is considered a single physical act within the meaning of the compulsory joinder statute).

¶ 100   For all the foregoing reasons, I am not persuaded that trial counsel rendered ineffective assistance of counsel.

¶ 101                                   II. Habitual Criminal

¶ 102   I turn now to the sentencing issues that defendant raised in his brief, namely, that the Habitual Criminal Act (730 ILCS 5/5-4.5-95(a) (West 2014)), as applied to him, violates (1) the proximate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11); and (2) the eighth amendment of the United States Constitution (U.S. Const., amend VIII). Specifically, defendant asks this court to remand "for resentencing where life without parole is not the only possible sentence." For the following reasons, I agree.

¶ 103   Before discussing the constitutionality issues briefed by both parties, I make a few preliminary but important observations.

¶ 104   First, I observe that the State does not claim on appeal either: that defendant forfeited these claims by failing to raise them in the court below; or that the record before us is insufficient

to address his as-applied claims. See *People v. Harris*, 2018 IL 121932, ¶¶ 35, 46 (after the State argued that the defendant failed to adequately develop the record for his as-applied challenge, the supreme court agreed). It is well established that "[t]he rules of waiver also apply to the State." *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46; *People v. Jones*, 2018 IL App (1st) 151307, ¶ 47 (by failing to make this argument, the State forfeited any claim that the defendant failed to raise in the court below his as-applied proportionate penalties and eighth amendment challenges); see also *People v. Whitfield*, 228 Ill. 2d 502, 509 (2007); *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003) ("It is well established that the State may waive waiver.").

¶ 105   Second, I observe that, with respect to defendant's challenge to the constitutionality of this statute, our standard of review is *de novo*. *People v. Pepitone*, 2018 IL 122034, ¶ 12.[6] *De novo* review means that we perform the same analysis that a trial court would perform. *Jones*, 2018 IL App (1st) 151307, ¶ 48. Since all statutes carry a strong presumption of constitutionality, courts resolve all doubts in favor of constitutionality. *Pepitone*, 2018 IL 122034, ¶ 12.

¶ 106   Third, I observe defendant raises an as-applied challenge, as opposed to a facial challenge. A facial challenge to the constitutionality of a statute is the most difficult to mount successfully, since a statute is facially invalid only if no set of circumstances exists under which it would be valid. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008); see also *Harris*, 2018 IL 121932, ¶ 38 ("[a] party raising a facial challenge must establish that the statute is unconstitutional under any possible set of facts"). By contrast, in an as-applied challenge, a party objects to how a statute was applied in the particular context to him or her, and the facts surrounding his or her particular circumstances become relevant. *Napleton*, 229 Ill. 2d at 306;

---

[6]In addition, "[s]ince the trial court never addressed this claim, there is no ruling by the trial court for us to review, and our review is by its very nature *de novo*." *Jones*, 2018 IL App (1st) 151307, ¶ 48.

see also *Harris*, 2018 IL 121932, ¶ 38 ("an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party").

¶ 107 "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005). "That right," the United States Supreme Court has "explained, 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" ' to both the offender and the offense." *Miller*, 567 U.S. at 469 (quoting *Roper*, 543 U.S. at 560, quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "And we view that concept less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society." ' " *Miller*, 567 U.S. at 469-70 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion))). It is on this evolving standard that defendant bases his claim. See *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (criminal punishment must conform to "[e]volving standards of decency").

¶ 108 The United States Supreme Court has observed that its eighth amendment cases "implicate two strands of precedent reflecting our concern with proportionate punishment." *Miller*, 567 U.S. at 470. The first strand has "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Miller*, 567 U.S. at 470 (citing *Graham*, 560 U.S. at 60-61) (listing cases). "[F]or example," the Court has held that "imposing the death penalty for nonhomicide crimes" violates the eighth amendment. *Miller*, 567 U.S. at 470 (citing *Kennedy*, 554 U.S. 407). The Court has

found that life without parole is the second most severe penalty permitted by law and that it shares "characteristics with death sentences that are shared by no other sentences." *Graham*, 560 U.S. at 69. Life without parole is similar to a death sentence in that it "alters the offender's life by a forfeiture that is irrevocable." *Graham*, 560 U.S. at 69. Also, "[i]t deprives the convict of the most basic liberties without giving hope of restoration." *Graham*, 560 U.S. at 69-70.

¶ 109    The United States Supreme Court has repeatedly "recognized the severity of sentences that deny convicts the possibility of parole." *Graham*, 560 U.S. at 70. Reviewing the history of its own cases, the *Graham* Court observed that, although the *Rummel* Court rejected an eighth amendment challenge to a life sentence for a defendant's third nonviolent felony, it "stressed that the sentence gave the defendant the possibility of parole." *Graham*, 560 U.S. at 70 (discussing *Rummel v. Estelle*, 445 U.S. 263, 280-81 (1980) (one "could hardly ignore the possibility that he will not actually be imprisoned for the rest of his life"). Similarly, in *Solem v. Helm*, 463 U.S. 277 (1983)[7], the Court considered the sentence before it "far more severe than the life sentence we considered in *Rummel*," precisely because it did not give the defendant the possibility of parole. *Solem*, 463 U.S. at 297 (discussed in *Graham*, 560 U.S. at 70 (noting that the *Solem* sentence was more severe "because it did not give the defendant the possibility of parole")).

¶ 110    The second strand involves the need to consider the individual characteristics of the defendant and the details of his offense before sentencing him. *Miller*, 567 U.S. at 470; *Graham*, 560 U.S. at 59 ("Under this approach, the Court has held unconstitutional a life without parole sentence for the defendant's seventh nonviolent felony, the crime of passing a worthless check." (citing *Solem*, 463 U.S. 277)). To determine whether a sentence is grossly disproportionate for a particular defendant's crime, the court must begin by comparing the gravity of the offense and

---

[7]The State's brief quotes *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) (opinion of Scalia, J., joined by Rehnquist, C.J.) as saying "*Solem* was simply wrong." However, that quote is very misleading. It comes from a portion of the *Harmelin* opinion that was joined by only one other justice.

the severity of the sentence. *Graham*, 560 U.S. at 60. If this threshold comparison leads to an inference of gross disproportionality, then the court should compare the defendant's sentence with the sentences received by other offenders for the same crime. *Graham*, 560 U.S. at 60. If this comparative analysis validates the initial judgment, then the sentence is cruel and unusual. *Graham*, 560 U.S. at 60.

¶ 111   Like the eighth amendment, the proportionate penalties clause of the Illinois Constitution embodies our evolving standard of decency. *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionality clause and the eighth amendment). Specifically, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship. *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). "A sentence of life imprisonment without parole, however, cannot be justified by the goal of rehabilitation. The penalty forswears altogether the rehabilitative ideal." *Graham*, 560 U.S. at 74. A penalty can violate the proportionate penalties clause: "(1) if it is so cruel, degrading, or disproportionate to the offense that the sentence shocks the moral sense of the community; or (2) if it is greater than the sentence for an offense with identical elements." *People v. Ligon*, 2016 IL 118023, ¶ 10.

¶ 112   The statute challenged by defendant is the Habitual Criminal Act, which provides in relevant part:

"(1) Every person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now *** classified in Illinois as a Class X felony, criminal sexual assault, aggravated kidnapping, or first degree murder, and who is thereafter convicted of a Class X felony, criminal sexual assault, or first degree murder, committed after the 2 prior convictions, shall be adjudged an habitual criminal.

* * *

(5) Except when the death penalty is imposed, anyone adjudged an habitual criminal shall be sentenced to a term of natural life imprisonment.

(6) *** After a plea or verdict or finding of guilty and before sentence is imposed, the prosecutor may file with the court a verified written statement signed by the State's Attorney concerning any former conviction of an offense set forth in this Section ***[.]" 730 ILCS 5/5-4.5-95 (West 2014).

¶ 113   This is certainly not the first time that a court has considered the constitutionality of this statute. Almost 25 years ago, in *People v. Dunigan*, 165 Ill. 2d 235, 241 (1995), our supreme court rejected claims that the Habitual Criminal Act *facially* violated (1) the *ex post facto* and double jeopardy clauses of the United States and Illinois Constitutions (U.S. Const., art. I, § 10 (*ex post facto*); U.S. Const., amend. V (double jeopardy); Ill. Const. 1970, art. I, § 16 (*ex post facto*); Ill. Const. 1970, art. I, § 10 (double jeopardy)); (2) the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment of the United States Constitution (U.S. Const., amend VIII); (3) the due process clauses of the United

States and Illinois Constitutions (U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2); and (4) the separation of powers provision of the Illinois Constitution (Ill. Const. 1970, art. II, § 1).

¶ 114   Although *Dunigan* concerned solely facial challenges and our case concerns solely an as-applied challenge, *Dunigan* still limits this court in what we can and cannot find, with respect to the constitutionality of this statute.

¶ 115   For example, in *Dunigan*, our supreme court found that "[t]he punishment imposed under the Act is for the most recent offense only." *Dunigan*, 165 Ill. 2d at 242. The court explained: "The Act does not punish a defendant again for his prior felony convictions, nor are those convictions elements of the most recent felony offense. Instead, they simply aggregate or enhance the penalty imposed for the third and most recent offense." *Dunigan*, 165 Ill. 2d at 242. As a result, in the case at bar, the life-without-parole sentence was imposed solely for defendant's drug offense. See *Dunigan*, 165 Ill. 2d at 243 (the Habitual Criminal Act "punishes him solely for" his third offense).

¶ 116   The *Dunigan* court rejected a facial challenge under the proportionate penalties clause, because the "legislature obviously considered the seriousness of the offense when it enacted the Act," since it applied the Habitual Criminal Act "only" to "offenses recognized to be particularly violent and dangerous to society." *Dunigan*, 165 Ill. 2d at 246; see also *Dunigan*, 165 Ill. 2d at 243 ("the legislature devised" the Habitual Criminal Act as "a separate sentencing scheme for criminal defendants who have demonstrated a propensity to commit violent crimes").

¶ 117   In the case at bar, defendant cites the evolving societal approach to both drug offenses and mandatory life punishment during the last 25 years to argue that a mandatory life-without-parole sentence for a drug offense now shocks the conscience. In support, he cites the dissent in *People v. Collins*, 2015 IL App (1st) 131145, ¶ 46 (Hyman, J., dissenting), which argued that it

was wrong to impose for a drug offense "the most severe, most onerous sentence possible, the same sentence imposed on a thrice-convicted ruthless murderer."

¶ 118   In *Fernandez*, where the appellate court rejected a defendant's proportionality challenge to a mandatory life sentence for a nonviolent offense, the *Fernandez* court observed that this was a question of first impression, and then, relying on *Fernandez*, the court in *Collins* similarly rejected a proportionality challenge to a mandatory life sentence for a nonviolent offense. *Fernandez*, 2015 IL App (1st) 120508, ¶ 48 (the court was unable to locate any "Illinois decisions addressing mandatory natural life imprisonment under the Act for nonviolent offenses" and thus considered the issue one of first impression); *Collins*, 2015 IL App (1st) 131145, ¶ 34 (majority opinion) (following *Fernandez*). All the other appellate court cases cited by the State involved violent offenses.[8]

¶ 119   The State encourages us to follow the majorities in *Fernandez* and *Collins*, while defendant urges us to adopt the *Collins* dissent. I do not support the dissent in *Collins* because I believe that, under certain circumstances, selling drugs as a business, where minors can be involved, is just as dangerous to society as a whole as the taking of a life.

---

[8]The cases cited by the State demonstrate the intent of the Habitual Criminal Act to apply to crimes of violence. They all involved violent offenses and were 25 years old, if not older: *People v. Withers*, 115 Ill. App. 3d 1077, 1089-91 (1983) (armed robbery and armed violence); *People v. McNeil*, 125 Ill. App. 3d 876, 881-82 (1984) (armed robbery and armed violence); *People v. Hartfield*, 137 Ill. App. 3d 679, 691 (1985) (rape); *People v. Morissette*, 150 Ill. App. 3d 431, 443 (1986) (armed robbery and armed violence); *People v. McCall*, 190 Ill. App. 3d 483, 496 (1989) (armed robbery); *People v. Franzen*, 183 Ill. App. 3d 1051, 1059 (1989) (aggravated sexual assault, kidnapping and battery); *People v. Robinson*, 268 Ill. App. 3d 1019, 1025-26 (1994) (armed robbery); *People v. Gaston*, 259 Ill. App. 3d 869, 877 (1994) (armed robbery); *People v. Wilson*, 257 Ill. App. 3d 826, 835 (1994) (armed robbery); *People v. Bryant*, 278 Ill. App. 3d 578, 587 (1996) (armed robbery).

With respect to the last and latest case cited by the State, *People v. Cummings*, 351 Ill. App. 3d 343, 348-49 (2004) (armed robbery), I observe that the defendant in that case finally received relief 12 years later in a postconviction appeal, when this court found that his armed robbery conviction was unconstitutionally disproportionate, and reversed and remanded for resentencing. *People v. Cummings*, 2016 IL App (1st) 143948-U, ¶ 1; see also *Ligon*, 2016 IL 118023, ¶ 17 (with respect to a subsequent *Cummings* decision that addressed the same proportionality issue (375 Ill. App. 3d 513, 521-22 (2007)), the supreme court held "*Cummings* is *** overruled"). Given the supreme court's statement, there is a question about whether the case cited by the State is still good law.

¶ 120   The State cannot argue that *Dunigan* and its progeny defeats defendant's claim and then argue that we should consider that one of his two prior felonies was for a violent offense. *Dunigan* could not be more clear on that point. Our supreme court emphasized: "The defendant *mistakenly* believes that the Act imposes a mandatory life sentence as punishment for all three of his felony convictions." (Emphasis added and omitted.) *Dunigan*, 165 Ill. 2d at 241. Thus, the mandatory life sentence is punishment for the third crime alone. That is the basis upon which the statute was found not to violate the *ex post facto* clauses. *Dunigan*, 165 Ill. 2d at 241-42. Thus, in the case at bar, there is no way around the fact that defendant received a mandatory life sentence solely for a drug crime, which was the possession of 27.6 grams of heroin and 78.7 grams of cocaine in his closet.

¶ 121   The *Dunigan* court did not face the question that we face today, because (1) the offense in *Dunigan* was for sexual assault, rather than a drug offense (*Dunigan*, 165 Ill. 2d at 240); and (2) the *Dunigan* defendant raised only facial challenges, rather than applied challenges, as in the case at bar.

¶ 122   All three offenses in *Dunigan* were for sex crimes. *Dunigan*, 165 Ill. 2d at 240. The third offense was for criminal sexual assault, and the two prior convictions were both for rape. *Dunigan*, 165 Ill. 2d at 240. High recidivism rates for sex offenders are well documented[9] and may have influenced the high court, who spoke in *Dunigan* about "particularly violent" offenses. *Dunigan*, 165 Ill. 2d at 246. In addition, "[t]he presence of violence as justification for the Habitual Criminal Act has long been recognized by this court." *Collins*, 2015 IL App (1st) 131145, ¶ 49 (Hyman, J., dissenting); see also *People v. Glover*, 173 Ill. App. 3d 678, 684 (1988)

---

[9]Both our supreme court and the United States Supreme Court have acknowledged the " 'frightening and high risk of recidivism' for convicted sex offenders." *Pepitone*, 2018 IL 122034, ¶ 22 (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002) (plurality opinion)); see also *People v. Minnis*, 2016 IL 119563, ¶ 41 ("the legislature is entitled to 'conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism' " (quoting *Smith v. Doe*, 538 U.S. 84, 103 (2003))).

(under the Habitual Criminal Act, a defendant is sentenced to life imprisonment only after committing three felonies that "involve the use of force or threat of force"); *McNeil*, 125 Ill. App. 3d at 884 "the habitual criminal act is a constitutional exercise of this State's police power to protect our society from habitually violent and heinous criminals").

¶ 123   Defendant acknowledges that, almost three decades ago, a closely divided United States Supreme Court upheld a state law that provided for mandatory life for a drug crime. *Harmelin*, 501 U.S. 957 (rejecting an eighth amendment challenge to a Michigan statute that provided for a mandatory life sentence for possession of 650 or more grams of cocaine); *Graham*, 560 U.S. at 59 (observing that the *Harmelin* court was "closely divided"). However, defendant argues that was then and this is now and that there has been a societal shift, with respect to both mandatory life-without-parole sentences and drug offenses.[10] Recent opinions by the United States Supreme Court have all but rejected Justice Scalia's approach in *Harmelin*, which focused on the law "both at the time of the founding and throughout the 19th century" (*Harmelin*, 501 U.S. at 995), in favor of an evolving standard of decency that marks the progress of a maturing society. *Miller*, 567 U.S. at 469-70; *Kennedy*, 554 U.S. at 420. Defendant's argument, in essence, is that this court can be, or not be, on the right side of history.[11]

¶ 124   Under current federal law, for example, the amounts of drugs in the case at bar, which were 27.6 grams of heroin and 78.7 grams of cocaine, are so small that defendant would be

---

[10]As the *Collins* dissent observed, "[s]entencing for nonviolent drug crimes has been evolving." *Collins*, 2015 IL App (1st) 131145, ¶ 56 (Hyman, J., dissenting). Under the federal sentencing statutes, defendant's current offense would not require life without parole, and California's "three strikes" law no longer requires life in prison if the third offense is a drug offense. See *Collins*, 2015 IL App (1st) 131145, ¶ 56 (Hyman, J., dissenting) (discussing these laws).

[11]Also not to be overlooked is the fact that "defendants of color are more likely to receive life sentences for nonviolent drug offenses." *Collins*, 2015 IL App (1st) 131145, ¶ 53 (Hyman, J., dissenting); United States Sentencing Comm'n, Life Sentences in the Federal System, at 7 (Feb. 2015), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf (last visited Aug. 21, 2019) [https://perma.cc/77CT-WKLV] (pie chart shows that 75% of the offenders serving life sentence were nonwhite).

subject to the smallest statutory penalty for distribution which, even after a prior drug conviction, would leave him eligible for a statutory penalty with no mandatory minimum and a maximum of 30 years. 21 U.S.C. § 841(b)(1)(C) (2012). For comparison's sake, in *Fernandez*, where the appellate court rejected the defendant's proportionality challenges to his mandatory life sentence under the Habitual Criminal Act, the defendant had sold over a kilogram of cocaine. *Fernandez*, 2014 IL App (1st) 120508, ¶ 1. Under federal law, that would make the defendant in *Fernandez* eligible for a statutory penalty of 10 years to life. 21 U.S.C. § 841(b)(1)(B)(ii) (2012) (for distribution of 500 grams or more of cocaine the statutory range is 10 years to life, with a prior conviction for a serious drug felony).[12] In rejecting a proportionality challenge, the *Fernandez* court observed that the amount of cocaine sold by the *Fernandez* defendant, which was over a thousand grams, "carrie[d] the highest sentencing range for distribution of cocaine under Illinois law." *Fernandez*, 2014 IL App (1st) 120508, ¶ 64.[13]

¶ 125   Unfortunately, neither party cites or discusses our supreme court's recent decision in *Harris*. Although neither party cited it or argued it, I consider it, particularly since our review is *de novo*. In *Harris*, our supreme court declined to consider an as-applied challenge under the proportionate penalties clause where it concluded that the record was not sufficiently developed concerning aggravating and mitigating circumstances. *Harris*, 2018 IL 121932, ¶ 46 (the record included "only basic information about defendant").

---

[12]Similar to the *Fernandez* defendant, in *Harmelin*, where the United States Supreme Court rejected the defendant's eighth amendment challenge to a life sentence, the defendant was convicted of possessing 672 grams of cocaine. *Harmelin*, 501 U.S. at 961. In *Collins*, which followed *Fernandez* in rejecting a proportionality challenge to a life sentence, the defendant was convicted of possessing 809 grams of cocaine. *Collins*, 2015 IL App (1st) 131145, ¶ 4 (majority opinion).

[13]The *Fernandez* court concluded: "In cases involving recidivist offenders who traffic *large* quantities of narcotics, courts have upheld the imposition of mandatory life without parole ***." (Emphasis added.) *Fernandez*, 2014 IL App (1st) 120508, ¶ 63. The *Fernandez* court repeated the word "large" a couple of times. *Fernandez*, 2014 IL App (1st) 120508, ¶¶ 63-64. By comparison, in the case at bar, defendant had a small fraction of the drugs that the *Fernandez* defendant did.

¶ 126    Turning to the record before us, it was sufficiently developed concerning mitigating and aggravating factors. See *People v. Buffer*, 2019 IL 122327, ¶¶ 46-47 (where "[a]ll of the facts and circumstances to decide defendant's claim are already in the record," the court could decide the claim and remand for a new sentencing hearing).  On the mitigation side is the evidence that defendant appears to be a devoted husband and father. When arrested, defendant was found at home, with his wife and children. He testified that he confessed because he did not want his wife, who was in the next room, to be charged with a crime over the guns. He testified that he could not bear the thought of his children being turned over to DCFS. When police found him after the jury verdict, he was with his wife and children. His last act before his arrest was to hug his son. He had his son exit with him, so that his son could watch his father peacefully turn himself in. Although defendant engaged in what may have been 'trash talking' during the ride to the station, the police officer sitting next to him had to admit that defendant had behaved like a perfect gentleman. During trial, defendant testified that he was a businessman, and his PSI indicated that he and his wife had founded and operated a company providing janitorial services.

¶ 127    At trial, defendant testified that the officers had threatened him with taking away his children and sending his children to DCFS if he did not confess that the guns were his. For their part, the officers denied making any such statement. However, whether or not the officers actually made such a statement, it would have been simply stating the obvious. At the time of his confession, his wife was in the next room at the police station, and defendant knew it. Although the record does not indicate whether she had been formally arrested, defendant testified that he knew that the police were holding her in the next room, and the police acknowledged in their testimony that she was, in fact, there. While the record does not state how his wife was transported, the record establishes that the police were holding both husband and wife at the

station after discovering drugs in his closet and guns in hers. According to the police themselves, the guns had been discovered—not in the closet with all the men's clothing—but in the closet with only women's clothing and in a hat box that contained only women's hats. Defendant claims that the police told him "someone needs to be charged" for the guns. Whether that was actually stated or not, it was clear that the police expected to charge someone with possession of the guns. Defendant claimed that the police stated that, if they charged his wife, then his children would be placed with DCFS. He claimed that the officers insisted that he had "to take ownership of everything," both the guns and the drugs, to avoid having his children sent to DCFS. The jury believed the testimony of the police that they made no such representations. However, if both parents were charged, then the likelihood is high that the police would have contacted a social services agency pertaining to the children. At trial, defendant's testimony did not implicate his wife, and so the jury was left with the question of whether he had possession, actual or constructive, which could be joint, over the guns that were found in her closet and the drugs that were found in his.

¶ 128   At sentencing, on the aggravation side, are the facts that defendant has three Class X felonies, and one of them was for aggravated battery with a firearm, in which defendant did display violence; and that defendant has spent a considerable amount of his 38 years behind bars.

¶ 129   In addition, I observe that the prosecutor failed to file a petition seeking the mandatory life sentence, until prompted to do so by the trial court. The trial court later observed that it had "required" the petition. Further, until the eve of trial, defendant could have received only 14 years on a plea agreement. While a simple disparity between the sentence offered during plea negotiations and that ultimately imposed does not, by itself, warrant a reduction in sentence, the disparity may warrant it when the sentence is many "times greater than that offered during plea

negotiations." *People v. Dennis*, 28 Ill. App. 3d 74, 78 (1975) (sentence reduced to a maximum of 18 years, where defendant was offered a maximum of 6 years and was sentenced to what was in essence a life sentence), *cited with approval by People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26 (reduction justified where "the actual sentence is outrageously higher than the one offered during plea negotiations"). Here it was outrageously higher as required by statute.

¶ 130   Further, after having first considered all the factors in mitigation and aggravation, the sentencing court concluded, immediately prior to sentencing, that it regretted having to sentence defendant to natural life in prison. Obviously, the trial court entered the sentence because the statute required him to do so. 730 ILCS 5/5-4.5-95 (West 2014).

¶ 131   In *Harris*, the supreme court stated that it "decline[d]" to remand for resentencing, indicating that it could remand but was choosing not to do so in that case.[14] *Harris*, 2018 IL 121932, ¶ 48. In *Harris*, the State had vigorously argued before the supreme court that the record was insufficient to decide defendant's as-applied challenge and observed that a postconviction or section 2-1401 petition was the better vehicle to address this claim. *Harris*, 2018 IL 121932, ¶¶ 35, 48. See 725 ILCS 5/122-1 *et seq.* (West 2016) (Post-Conviction Hearing Act); 735 ILCS 5/2-1401 (West 2016) (describing a petition seeking relief from final judgment). In marked contrast, the State in our case has made no such argument.[15]   See *Buffer*, 2019 IL 122327, ¶¶ 46-47 (where the defendant's claim for resentencing did not require further "factual development,"

---

[14]In *Harris*, our supreme court also recognized an exception to the general rule requiring an evidentiary hearing for as-applied challenges, where "the record ha[s] been developed sufficiently for appellate review." *Harris*, 2018 IL 121932, ¶¶ 43-44 (citing a life-without-parole case as an example of the type of case where an evidentiary hearing was not required).

[15]*Harris* is further distinguishable, since it did not involve a life-without-parole sentence and it did involve first degree murder and multiple violent offenses. *Harris*, 2018 IL 121932, ¶ 1. *People v. Vega*, 2018 IL App (1st) 160619, which followed *Harris*, is distinguishable for the same reasons: it did not involve a life-without-parole sentence, and it did involve multiple attempt first degree murders. Also *Vega* involved a discretionary sentence, fashioned by the trial court, rather than a mandatory sentence. *Vega*, 2018 IL App (1st) 160619, ¶ 61.

the proper remedy was to vacate the sentence and remand for a new sentencing hearing). Thus, I would find that a mandatory life without parole sentence, as applied to defendant, violates the eighth amendment and our state's proportionate penalties clause, and I would remand for resentencing without using the mandatory nature of the life-without-parole sentence.[16] See *Collins*, 2015 IL App (1st) 131145, ¶ 35 ("We agree that imposing a mandatory life sentence on a nonviolent offender is harsh and we question the wisdom of the legislature in this regard."); *Fernandez*, 2014 IL App (1st) 120508, ¶ 43 (acknowledging that a sentence of mandatory life without parole for a drug offense is "extremely harsh"), ¶ 55 (acknowledging "the distorting effect of mandatory life sentences without the possibility of parole"). This would permit a hearing by the trial court to develop fully the factual record of mitigating and aggravating factors and would allow the trial court to exercise its discretion to fashion the most appropriate sentence, including a discretionary life sentence if it so decides that to be the most appropriate sentence.

¶ 132 Normally, a trial court's sentencing decision within a permitted sentencing range is entitled to great deference, and a reviewing court will not reverse the exercise of that discretion unless an abuse has occurred. *People v. Jackson*, 375 Ill. App. 3d 796, 800-01 (2007). A reviewing court may not reverse simply because it would have weighed the factors differently than the trial court did. *Jackson*, 375 Ill. App. 3d at 800-01. However, in the case at bar, the trial court had no opportunity to exercise *any* discretion, so the issue of deference becomes moot.

¶ 133 I would reverse and remand in order to enable the sentencing court "to consider the characteristics of a defendant and the details of his offense before sentencing him," where this was a nonviolent offense, where it was for a relatively small amount of drugs, where the State determined on the eve of trial that 14 years would be an appropriate sentence, where the State

---

[16]I observe that we could also achieve the same result by exercising the discretion afforded to us by Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) to reduce defendant's mandatory sentence by remanding for resentencing without the mandatory requirement of the life-without parole sentence.

filed its petition only after the trial court required it, and in light of all the other circumstances particular to this case. See *Miller*, 567 U.S. at 470.[17] I cannot find under the facts of this particular case that a trial court should be required to sentence this defendant to a mandatory life sentence without the possibility of parole. I would vacate defendant's sentence and remand for a resentencing where the trial court has the option to impose or not impose a life sentence.

¶ 134                                    Conclusion

¶ 135  For the foregoing reasons, I am not persuaded by defendant's claims of ineffective assistance of counsel, and thus, I would affirm his conviction. As a result, I must respectfully dissent from the majority's decision. However, I would remand for resentencing as explained above.

---

[17]Under the eighth amendment, the United States Supreme Court "prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him." *Miller*, 567 U.S. at 470.

**No. 1-15-2112**

| | |
|---|---|
| **Cite as:** | *People v. Utley*, 2019 IL App (1st) 152112 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-6126; the Hon. Thomas P. Fecarotta Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Michael Gomez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, Assistant State's Attorneys, of counsel), for the People. |