2022 IL App (2d) 200537-U
No. 2-20-0537
Order filed February 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-670 |
| ALEX SALGADO, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions of home invasion and unlawful possession of weapons by a felon were reversed, and the cause was remanded for a new trial. Although the evidence was sufficient to sustain the convictions, and although defendant's counsel did not provide ineffective assistance in failing to request severance of the charges, counsel was ineffective in failing to (1) request a limiting instruction, (2) object to improper lay opinion identification testimony, and (3) object to an improper comment during the State's rebuttal argument.

¶ 2    Following a jury trial, defendant, Alex Salgado, was found guilty of four counts of home

invasion (720 ILCS 5/19-6(a)(2)-(5) (West 2016)), one count of aggravated battery with a firearm

(720 ILCS 5/12-3.05(e)(1) (West 2016)), and two counts of unlawful possession of weapons by a

felon (UPW) (720 ILCS 5/24-1.1(a) (West 2016)). The trial court sentenced defendant to an aggregate 38 years' incarceration in the Illinois Department of Corrections. Defendant appeals, and we reverse and remand for a new trial.

¶ 3                                I. BACKGROUND

¶ 4      In April 2018, defendant was charged with the offenses referenced above arising out of the shooting of Michael Padron on March 24, 2018.

¶ 5      Defendant's jury trial commenced on July 10, 2018. Officer Jesse Geiken of the Rockford Police Department testified that, at 1:17 p.m. on March 24, 2018, he responded to a report of shots fired at 161 Broadway in Rockford. When he arrived, he parked in an alley directly behind the residence, then walked toward the back door with another officer who had arrived just before he had. The back door had bullet holes in it, and there were several spent .223 caliber casings on the porch. As Geiken approached the door, Padron emerged from the house. Padron had a gunshot wound to his lower left leg, and Geiken helped him into a nearby chair. Geiken then entered the residence, where he located several bags containing what appeared to be cannabis. Thereafter, Geiken traveled to 510 North Day Avenue in Rockford because he learned that the shooting suspects were believed to be inside the house at that address. Other officers were present when Geiken arrived. They formed a perimeter and called in an armored vehicle. After the armored vehicle arrived, Ariel Galindo and defendant exited the house. Officers took them into custody, then Geiken assisted in searching the house, where officers located, among other things, an AR-15 rifle under a couch cushion.

¶ 6      Padron testified that, on March 24, 2018, he drove to Ana Juarez's home at 161 Broadway to visit her. He parked in the rear driveway, which was accessible from an alleyway that ran behind the residence. Padron entered the house through the back door. After talking with Juarez for about

thirty seconds, he heard two kicks at the door, then multiple gunshots. The gunshots came through the door, and Padron and Juarez fled to the basement. Soon, two masked individuals came down the steps. One of the individuals approached Padron, pointed a "big gun" at him, and asked "where the money was at." Padron responded that he did not know and that he did not live there. The individual then shot Padron in the left leg, and both masked individuals left. After police officers arrived at the scene, Padron was taken to Swedish American Hospital, where he remained for two weeks. His tibia had been "completely destroyed," and he had to have metal rods implanted. At the time of trial, Padron was still using crutches. Padron acknowledged that, because the individuals were masked and covered, he could not identify them or even tell what their races were.

¶ 7    Dr. Richard Hermann treated Padron on March 24, 2018. Dr. Hermann explained that Padron had a gunshot wound to his lower left leg, near his knee, that caused a complex fracture and required orthopedic surgery.

¶ 8    Yesenia Ruacho testified that she was Juarez's neighbor. At 1:17 p.m. on March 24, 2018, Yesenia heard gunshots and called 911. She went outside to see where the shots were coming from and saw a black "sporty looking car" with its doors open. No one was inside it. Soon, however, she saw two individuals run to the car from 161 Broadway and drive away. Yesenia could not describe what the individuals looked like or identify their races, because they wore ski masks.

¶ 9    Samuel Ruacho, Yesenia's brother, testified that he lived down the street from 161 Broadway. On March 24, 2018, Samuel heard gunshots, then he stepped onto his porch to see what was happening. He saw a black, sporty-looking Audi with its doors open. Two "guys" ran toward the Audi from 161 Broadway. They were wearing black. One individual was "skinny," and the other was a "bigger heavyset guy." Samuel could not discern the races of the individuals. Samuel

had security cameras on his home, including one that was pointed toward the alley behind 161 Broadway. When officers arrived at 161 Broadway, Samuel turned over footage from the cameras. On cross-examination, Samuel acknowledged that he had told an officer after the shooting that he saw "two black males running back to the black Audi." He explained, however, that he only "assumed they were black."

¶ 10 Detective Spencer Berke, a crime scene detective with the Rockford Police Department, testified that he collected .223 shell casings from the back porch and basement of 161 Broadway.

¶ 11 Sergeant Brad Stien of the Rockford Police Department testified that he responded to 161 Broadway upon learning of the shooting. He and Officer Geiken located Padron in the rear of the house, and they helped him outside because his leg was injured. Thereafter, Stien met with Officer David Watson to review Samuel's surveillance footage. Stien testified as to what the video depicted, and the following is his description of what he saw on the video. A blue Dodge Durango drove westbound through the alley behind 161 Broadway, then turned into the driveway behind the residence. A black Audi then drove through the alley in the same direction and moved out of frame. The Audi had newer aftermarket rims, a shiny silver or chrome gas cap, and tinted windows. Shortly thereafter, a "heavier set person" wearing dark clothing and carrying a "shorter length rifle" went through the alley and up the driveway, moving out of frame. A "taller, more slender" individual in dark clothing followed. Minutes later, the tall, slender person went back through the alley while carrying a container, and the "heavier set subject" followed while still carrying the "same short style rifle." Stien testified that "the definitive things that were in the video that you could see" included "a short style rifle," the individuals' "size[s]" and "build[s]," their gaits, and "their comparison of one versus the other."

¶ 12    Stien testified that, while he was at the scene at 161 Broadway on March 24, 2018, he gave a description of the Audi to dispatch. Stien then learned that a possible vehicle match had been located at 510 North Day. Stien went to that address and saw the vehicle. He determined from its rims, gas cap, and windows that it was the same car that he had seen in the surveillance footage. Stien testified that, about 30 to 45 minutes after the Audi had initially been located, Galindo exited the house. When Galindo emerged, Stien told nearby officers, "[T]hat's the tall slender guy in the security footage." According to Stien, Galindo had an "extremely similar build, extremely similar clothing," and a similar gait to the tall person in the video. Stien testified that defendant then exited the residence. According to Stien, defendant was not wearing the same clothing as the individual in the footage, but "the body type and shape was very similar." Defendant did not object to that testimony. After officers detained defendant and Galindo, they searched the house. No one else was inside. Stien explained that in the living room on the first floor, there was a bed and a couch. On the bed, officers found a magazine for an AR-15 and plastic cartridges that were .223 caliber. Under a cushion on the couch, Stien found a disassembled AR-15. Stien testified that the AR-15 used .223 caliber ammunition and that "the barrel length of this weapon was extremely short." He explained that the weapon was a "ghost AR-15," meaning that it had no serial number or other identifiable mark on it. In the kitchen, Stien located the charging handle for the AR-15 in an air duct. Stien noted that officers also found a bag containing a 9-millimeter firearm that was missing parts. Several parts to that weapon were found in the basement.

¶ 13    Officer Andrea Genkinger of the Rockford Police Department testified that she assisted in the search of 510 North Day. Genkinger found a mask shoved between the bed and the wall in the living room. She also searched the Audi and found a box of .223 caliber ammunition and several rounds of handgun ammunition.

¶ 14 Officer Carl Bergstrom of the Rockford Police Department testified that, upon learning, at 1:17 p.m., that shooting suspects fled from 161 Broadway in a black Audi, he looked up police reports that mentioned black Audis. He found one report from the prior evening in which a black Audi fled from an officer. Bergstrom looked up that vehicle's license plate and learned that it was "associated" with 510 North Day, which he knew was about a 10-to-15-minute drive from 161 Broadway. Bergstrom drove to 510 North Day and arrived at 1:33 p.m. He saw a black Audi parked in the driveway, and its license plate number matched the one from the police report. Bergstrom felt the hood, which was warm to the touch, then notified dispatch. Officers arrived "very quickly." An armored vehicle was requested, and when it arrived, Galindo exited the house "on his own will." Officers then used the microphone system and ordered defendant outside. Defendant exited the house. As he was being handcuffed, he started making "funny noises" and "flinching and kicking" toward a police dog at the scene. According to Bergstrom, defendant "was very nonchalant about the whole thing." Bergstrom testified that, once he arrived at 510 North Day, no one entered or exited the residence until Galindo and defendant emerged. Bergstrom then assisted in searching the residence. He found multiple parts of a rifle in a pool of sewage under a rug in the basement. Additionally, he found wet clothes and towels in the bathroom linen closet. On the toilet, there were toilet paper rolls containing what smelled and appeared to be cannabis. There was vacuum-sealed packaging on the floor, and the floor was wet.

¶ 15 Officer David Watson of the Rockford Police Department testified that, after responding to the shooting at 161 Broadway, he reviewed and downloaded the surveillance video captured by Samuel's cameras. Watson explained that the timestamp on the video was three minutes fast. The video was admitted into evidence.

¶ 16    Detective Bruce Voyles of the Rockford Police Department testified that he collected evidence from 510 North Day. This evidence included the AR-15, the 9-millimeter handgun, boxes of .223 and 9-millimeter ammunition, the black mask, and cannabis. Voyles also collected black denim pants and a hooded sweatshirt that officers found. Voyles test-fired the AR-15 and determined that it was working properly. He attempted to obtain fingerprints from the AR-15, but he could not locate any that were suitable for comparison to a known fingerprint. Voyles acknowledged that police officers did not attempt to obtain fingerprints from the spent shell casings, test defendant's clothes for any gunshot residue, test a hair that had been found on the mask, or investigate the identity of "T. James," whose name was written on the inside of the jeans that had been recovered.

¶ 17    Heather May, a forensic scientist with the Illinois State Police, testified as an expert in DNA analysis. May explained that she examined a swab from the AR-15 for DNA. May found no DNA suitable for comparison because the swab contained a mixture of DNA from at least four individuals. Accordingly, she had no opinion as to who had handled the AR-15.

¶ 18    Detective Brian Strawser of the Rockford Police Department testified that, on March 24, 2018, he photographed defendant and Galindo. Strawser also photographed and collected their clothing, which was introduced into evidence.

¶ 19    Amanda Darnell, a forensic scientist with the Illinois State Police, testified as an expert in firearms identification. Darnell reassembled the AR-15 recovered from 510 North Day and obtained test shots to compare them against the spent .223 shell casings found at 161 Broadway. Darnell testified that, after examining the characteristics of the test casings and the recovered casings, it was her opinion that the AR-15 obtained from 510 North Day fired the .223 shell casings recovered from 161 Broadway.

¶ 20     At the close of the State's evidence, the court informed the jury that the court would read a stipulation by the parties pertaining to "facts that you can consider for purposes of the case." The stipulation, *inter alia*, concerned defendant's prior felony convictions for possession of a firearm without a firearm owner's identification card, aggravated unlawful use of a weapon, and aggravated fleeing to elude. However, the jury did not learn the details of those convictions. The court informed the jury that defendant "was a convicted felon on March 24, 2018." The defense rested without presenting evidence.

¶ 21     During closing argument, the State contended that Stien's testimony—that defendant's body type resembled the heavyset individual in the video—along with defendant's presence at a location where items connected to the shooting were recovered, was circumstantial evidence establishing defendant's guilt. On rebuttal argument, the State also compared the shoes that defendant wore when he was arrested to the shoes seen in the surveillance video. The State argued, without objection from defendant, "there's something particular about those black shoes [defendant wore during his arrest]. First of all, you'll notice that they're big. These are size 12 shoes. You'll notice in the video those are big shoes. Size 12 shoes."

¶ 22     The jury found defendant guilty on all counts. On August 13, 2018, both defendant, acting *pro se*, and his counsel filed separate motions for a new trial. Defendant's motion alleged several claims of ineffective assistance of counsel. On August 27, 2018, defendant's trial counsel withdrew as counsel, and the court appointed the public defender's office to represent defendant.

¶ 23     On September 19, 2018, the court held a preliminary hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). An assistant public defender was present with defendant. The court permitted defendant to explain his complaints regarding trial counsel's representation and allowed defendant's trial counsel to respond. As is relevant here, defendant first alleged that counsel was

ineffective for failing to object to Stien's lay opinion identification testimony that defendant fit the "profile" of one of the subjects in the surveillance video. Defendant's trial counsel responded that Stien presented no explicit identification testimony but testified only that defendant "looked similar in body shape" to the individual in the video.

¶ 24    Defendant also alleged that trial counsel should have prevented the State from introducing evidence obtained from 510 North Day, including the firearms, ammunition, and cannabis. Counsel responded that he believed that any such attempt would have failed, and the better strategy was to argue that defendant "didn't even know that stuff was there." In response to a question from the trial court, counsel noted that he did not seek to sever defendant's UPW charges from the other charges. Counsel explained that he and defendant believed that the State would be unable to prove that defendant had participated in the home invasion. Accordingly, they wanted to "do nothing to delay the running of the speedy trial clock," which would have given the State additional time to prepare for trial. Thus, after discussing the speedy trial implications, they "agreed that we were not going to sever that count."

¶ 25    Defendant further alleged that, because the State introduced the firearms and narcotics evidence from 510 North Day, counsel should have requested Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved October 17, 2014) (hereinafter IPI Criminal No. 3.14), which limits the jury's consideration of evidence of uncharged crimes. Counsel responded that the better strategy was to emphasize that no evidence directly linked defendant to those items.

¶ 26    On November 8, 2018, the trial court denied all of defendant's ineffective-assistance claims, finding that each lacked "legal or factual merit and pertain only to matters of trial strategy."

¶ 27    On November 1, 2019, defendant's appointed counsel filed an amended motion for a new trial. As is relevant here, defendant alleged that his trial counsel was ineffective for "failing to

object and allowing [Stien] to testify to the contents of a video as if he was an eye witness," failing to object to Stien's identification testimony, and failing to "file a motion to sever the weapons count from the other counts." The motion further alleged that "the state improperly argued" that the shoes worn in the video were size 12 when no such evidence was presented at trial.

¶ 28    On June 19, 2020, the trial court denied the amended motion for a new trial. On September 11, 2020, the trial court sentenced defendant to 31 years in prison for home invasion involving the personal discharge of a firearm.[1] Because the court found that defendant's conduct caused severe bodily harm, that sentence ran consecutively to concurrent terms of three years and seven years for the UPW counts. Accordingly, the trial court sentenced defendant to a total term of 38 years' imprisonment. On September 14, 2020, defendant filed a motion to reconsider the sentence, which the trial court denied. Defendant timely appealed.

¶ 29                                II. ANALYSIS

¶ 30                         A. Sufficiency of the Evidence

¶ 31    Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of either home invasion or UPW because the State failed to prove that he was one of the perpetrators of the offenses at 161 Broadway.

¶ 32     In all criminal prosecutions, the State must prove, beyond a reasonable doubt, that a crime was committed and the identity of the person who committed the offense. *People v. Lara*, 2012 IL 112370, ¶ 17. When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any

---

[1] The remaining home invasion and aggravated-battery-with-a-firearm counts merged into this count.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64. All reasonable inferences are drawn in favor of a finding of guilt. *People v. Swenson*, 2020 IL 124688, ¶ 35. This standard applies whether the evidence is direct or circumstantial. *Jackson*, 2020 IL 124112, ¶ 64. Additionally, circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction. *Jackson*, 2020 IL 124112, ¶ 64. It is the trier of fact's responsibility to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 2020 IL 124112, ¶ 64. The trier of fact need not "find each fact in the chain of circumstances beyond a reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70. Instead, it "must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70. It is not the function of the reviewing court to retry the defendant. *Jackson*, 2020 IL 124112, ¶ 64. Accordingly, the reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses. *Jackson*, 2020 IL 124112, ¶ 64. To set aside a criminal conviction on a challenge to the sufficiency of the evidence, the evidence must be so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Jackson*, 2020 IL 124112, ¶ 64. When addressing a challenge to the sufficiency of the evidence, we consider both properly and improperly admitted evidence. *People v. King*, 2020 IL 123926, ¶ 52.

¶ 33     Defendant's sole challenge to the sufficiency of the evidence is that the State failed to prove the element of identity, *i.e.*, that he was one of the individuals who entered 161 Broadway and shot Padron. Defendant asserts that no eyewitness identified him as a perpetrator of the offenses, and the "only evidence" connecting him to the crimes was his presence at 510 North Day. The State

counters that sufficient circumstantial evidence established defendant's identity as one of the perpetrators.

¶ 34　We find *People v. Darrah*, 18 Ill. App. 3d 1018 (1974), instructive. In *Darrah*, a witness observed two men exit the back of an apartment building and drive away in a black and gray Oldsmobile Tornado at 9:00 p.m. *Darrah*, 18 Ill. App. 3d at 1019. Both men were six feet tall, one was wearing a yellow windbreaker, and the other had dark hair. *Darrah*, 18 Ill. App. 3d at 1019. The witness entered the building and saw that coin boxes were missing from the washer and dryer in the laundry room. *Darrah*, 18 Ill. App. 3d at 1019. At 9:16 p.m., he called the police and gave descriptions of the men and vehicle he observed. *Darrah*, 18 Ill. App. 3d at 1019. An officer, upon hearing a description of the vehicle, pulled over a black and gray Tornado occupied by the defendants at 9:25 p.m. *Darrah*, 18 Ill. App. 3d 1019-20.  The officer noticed coins on the floor of the defendants' vehicle. *Darrah*, 18 Ill. App. 3d at 1020. The officer searched the vehicle and found, *inter alia*, several socks filled with quarters and dimes, a pocket knife, coin wrappers, and plastic trays for counting and rolling coins. *Darrah*, 18 Ill. App. 3d at 1020. One of the defendants was found to be carrying keys used to open coin-operated washers and dryers. *Darrah*, 18 Ill. App. 3d at 1020. Although the defendants were not identified as the individuals seen at the crime scene, they were found guilty of burglary, possession of burglary tools, and theft under $150. *Darrah*, 18 Ill. App. 3d at 1019, 1021-22. On appeal, they argued that there was insufficient evidence to prove that they were the perpetrators of the offenses at the apartment building. *Darrah*, 18 Ill. App. 3d at 1021. The appellate court rejected their argument and affirmed their convictions. *Darrah*, 18 Ill. App. 3d at 1022. The court explained that "the identity of the accused may be established by circumstantial evidence," and that, as to the defendants, "the radioed descriptions, the time and place at which defendants were apprehended and the product of the searches, provided substantial

circumstantial evidence" that they were the individuals who committed the charged crimes. *Darrah*, 18 Ill. App. 3d at 1022.

¶ 35    Like *Darrah*, although no eyewitness identified defendant as one of the individuals who entered 161 Broadway and shot Padron, circumstantial evidence permitted the jury to conclude that he was one of the perpetrators. Padron testified that, on March 24, 2018, two people entered 161 Broadway, and that an individual with a "big gun" shot him in the leg. Both Yesenia and Samuel testified that, after hearing gunshots at 1:17 p.m., they saw two masked individuals running from 161 Broadway toward a black Audi. Yesenia called 911, and Samuel observed that one of the "guys" was tall and skinny, while the other was a "bigger heavyset guy." Security footage taken at the time of the shooting first depicted a black Audi moving through the alley behind 161 Broadway, then showed two individuals moving toward the rear of the house and later running back along the same path. Stien reviewed this footage and observed that one of the individuals was tall and slender, while the other was a "heavier set person" who was carrying a "shorter length rifle." Within 17 minutes of the shooting, Bergstrom located a vehicle of interest at 510 North Day, which he knew was a 10-to-15-minute drive from 161 Broadway, and Stien believed that the vehicle was the same one the perpetrators used to flee 161 Broadway. From the time officers arrived at 510 North Day until defendant and Galindo exited the house, no one else entered or exited the residence. Stien testified that Galindo had a "similar build" to the tall, slender individual in the security footage, and defendant had a "very similar" "body type and shape" to the heavier set individual. Upon searching the house, officers found, *inter alia*, a mask, ammunition consistent with the shell casings found at 161 Broadway, and an AR-15 that was ultimately determined to be the same weapon used at 161 Broadway.

¶ 36    Although the evidence in this case was circumstantial and not overwhelming, it was the jury's responsibility to weigh that evidence and to draw reasonable inferences. *Jackson*, 2020 IL 124112, ¶ 64. When viewing the foregoing evidence in the light most favorable to the prosecution, the jury could conclude that defendant committed the charged offenses. Accordingly, we hold that the evidence was sufficient to prove defendant's identity and convict him of home invasion and UPW.

¶ 37                                    B. Ineffective Assistance of Counsel

¶ 38    Defendant next argues that his trial counsel provided ineffective assistance by failing to (1) move to sever the UPW charges from the remaining charges, (2) request Illinois Pattern Jury Instructions, Criminal, No. 3.13X (approved October 17, 2014) (hereinafter IPI Criminal No. 3.13X), (3) object to Stien's narration of the surveillance video and lay opinion identification testimony, and (4) object to the State's claim in its rebuttal argument that defendant and one of the individuals in the surveillance video both wore size 12 shoes. The State responds that each argument is meritless because defendant failed to show either that counsel performed deficiently or that any deficient performance prejudiced him.

¶ 39    To succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must show that his counsel's performance was deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *People v. Moore*, 2020 IL 124538, ¶ 29. An attorney's performance is deficient where he or she made an error that was so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. We apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and a defendant must overcome the presumption that his

counsel pursued a sound trial strategy. *Strickland*, 466 U.S. at 689. A defendant establishes prejudice where "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In other words, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The defendant must satisfy both prongs under *Strickland*, and if a reviewing court determines that he has failed to satisfy either one, it need not consider the other. *People v. Guerrero*, 2011 IL App (2d) 090972, ¶ 60. Whether counsel provided ineffective assistance "requires a bifurcated standard of review, wherein a reviewing court must defer to the trial court's findings of fact unless they are against the manifest weight of the evidence but make a *de novo* assessment of the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim." *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007).

¶ 40    Before we reach the merits of defendant's claims, we note that defendant's arguments that counsel was ineffective for failing to offer IPI Criminal No. 3.13X and for failing to object to the State's reference to a shoe size during closing argument were not raised in the trial court. Ordinarily, we would deem these arguments forfeited. See *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 136 (where defendant, who was represented by new posttrial counsel, failed to raise part of ineffectiveness claim in trial court, that portion of defendant's claim was forfeited); *People v. Ramos*, 339 Ill. App. 3d 891, 899-900 (2003) (court would not address argument that defendant, who was represented by new posttrial counsel, "did not include *** in either the motion or amended posttrial motion he filed"). In the trial court, defendant complained that counsel failed to request IPI Criminal No. 3.14, not IPI Criminal No. 3.13X. Similarly, while defendant argued that the State improperly commented on shoe size during closing arguments, he did not frame that

claim as one involving ineffective assistance stemming from counsel's failure to object to that comment. The State, however, does not argue forfeiture of these claims, and thus, we will consider them. See *People v. McKown*, 236 Ill. 2d 278, 308 (2010) (State forfeits a forfeiture argument by failing to raise it in appellate court).

¶ 41    Defendant first argues that counsel was ineffective in failing to move to sever the UPW charges from the home invasion charges. Defendant asserts that, while the State had to establish that he had a prior felony conviction to prove him guilty of UPW,[2] evidence of that conviction would not have been permitted for the home invasion charges. He thus claims that counsel's omission allowed the jury to learn that he was a felon and to improperly use that evidence in considering his guilt on the home invasion charges.

¶ 42    However, a defense decision not to seek severance is generally regarded as a matter of trial strategy, even if such a decision may prove unwise in hindsight. See *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28 (reasonable strategy not to seek severance and instead to pursue "all or nothing" strategy, thereby exposing jury to information it would not have otherwise heard, where counsel believed getting two acquittals in one proceeding was more likely than in two); *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996) (reasonable strategy not to seek severance based upon counsel's determination that, even in the trial on the severed count, the jury would learn of defendant's prior felony because he intended to testify, and his credibly would be impeached with

_____

[2] It is "unlawful for a person to knowingly possess on or about his person *** any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2016).

prior felony). Defendant relies on *People v. Utley*, 2019 IL App (1st) 152112, to counter that the failure to file a motion to sever cannot constitute reasonable trial strategy. *Utley* is distinguishable.

¶ 43     In *Utley*, the defendant faced charges of possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. *Utley*, 2019 IL App (1st) 152112, ¶ 1. Although evidence of the defendant's prior convictions was required to prove only the firearm offenses, counsel did not move to sever the charges. *Utley*, 2019 IL App (1st) 152112, ¶¶ 1, 35. Additionally, counsel did not file a motion *in limine* or stipulate to the fact of the defendant's convictions, which would have limited what the State could introduce in proving them. *Utley*, 2019 IL App (1st) 152112, ¶ 48. Thus, at trial, the State offered into evidence certified copies of the defendant's prior convictions for aggravated battery with a firearm and unlawful delivery of a controlled substance. *Utley*, 2019 IL App (1st) 152112, ¶ 15. On appeal, the defendant argued that counsel's failure to move to sever the firearm charges from the drug charges constituted ineffective assistance because it allowed the jury to consider his prior felonies when determining his guilt on offenses for which such evidence was unnecessary. *Utley*, 2019 IL App (1st) 152112, ¶¶ 35, 39.  The appellate court agreed and reversed the defendant's convictions. *Utley*, 2019 IL App (1st) 152112, ¶¶ 48, 52, 72. The court rejected the State's argument that counsel's omission "should be seen as trial strategy," because the State did not "identify any particular 'strategy' that was served by [counsel's] decision," and nothing in the record suggested any strategic motive. *Utley*, 2019 IL App (1st) 152112, ¶¶ 43, 48. Additionally, because counsel "made no attempt" to file a motion *in limine* or to stipulate to the offenses, the jury was permitted to hear the specific nature of the felonies and consider that evidence without any minimization of the prejudice to the defendant. *Utley*, 2019 IL App (1st) 152112, ¶¶ 48, 52.

¶ 44    Unlike *Utley*, the record clearly establishes that counsel made a strategic decision not to move to sever the charges. At the *Krankel* hearing, counsel explained that, because he and defendant did not believe that the State could prove that defendant participated in the home invasion, they decided to "do nothing to delay the running of the speedy trial clock," including moving to sever the counts, because they did not want to give the State additional time to prepare for trial. Additionally, unlike *Utley*, counsel attempted to minimize the prejudice that defendant faced by stipulating to the fact of his prior convictions, such that the jury did not learn of the specific nature of his prior offenses.

¶ 45    This case more closely resembles *Fields*, 2017 IL App (1st) 110311-B. In *Fields*, the defendant, a felon, was charged with armed robbery and being an armed habitual criminal. *Fields*, 2017 IL App (1st) 110311-B, ¶¶ 1, 14. Trial counsel did not move to sever the charges, and instead agreed to stipulate to the fact of the prior convictions without indicating the nature of the offenses. *Fields*, 2017 IL App (1st) 110311-B, ¶¶ 4, 23. At trial, the jury was read the parties' stipulation that the defendant had "two qualifying felony convictions to be considered" in connection with the armed habitual criminal charge. *Fields*, 2017 IL App (1st) 110311-B, ¶ 14. On appeal, the defendant argued that counsel was ineffective in failing to move to sever the charges. *Fields*, 2017 IL App (1st) 110311-B, ¶ 23. The court rejected the defendant's argument, noting that, "when deciding whether to seek a severance, defense counsel may choose to pursue an 'all or nothing' trial strategy, in which the defendant is acquitted or convicted of all charges in a single proceeding." *Fields*, 2017 IL App (1st) 110311-B, ¶ 28. The court reasoned that, because counsel "may have believed that the odds of getting two acquittals were greater in one proceeding, rather than two proceedings," the defendant failed to overcome the presumption that counsel's inaction was reasonable trial strategy. *Fields*, 2017 IL App (1st) 110311-B, ¶ 28. This was particularly so

where counsel's stipulation prevented the jury from hearing the specific nature of the offenses. *Fields*, 2017 IL App (1st) 110311-B, ¶ 28.

¶ 46    Here, counsel similarly pursued an "all-or-nothing" trial strategy, opting to prevent any delay and try the case based upon his determination that the State's evidence was too weak to prove that defendant was one of the perpetrators. Notably, in lieu of a motion to sever the charges, counsel stipulated to the fact of defendant's convictions, without disclosing the nature of the offenses, thereby minimizing the prejudice defendant faced by trying all counts at once. Under these circumstances, we cannot find that counsel's representation fell below an objective standard of reasonableness, and we hold that counsel did not provide ineffective assistance by failing to file a motion to sever the charges against defendant.

¶ 47    Defendant also contends that counsel was ineffective in failing to request IPI Criminal No. 3.13X, which, because he did not testify, would have read:

> "Ordinarily, evidence of a defendant's prior conviction of an offense may not be considered by you as evidence of his guilt of the offense with which he is charged. However, in this case, because the State must prove beyond a reasonable doubt the proposition that the defendant has previously been convicted of ____, you may consider evidence of defendant's prior conviction of the offense of ____ only for the purpose of determining whether the State has proved that proposition." IPI Criminal No. 3.13X.

Defendant argues that no strategic reason can explain counsel's failure to request IPI Criminal No. 3.13X in this case, where defendant stipulated to the fact that he is a felon. Defendant asserts that counsel's omission prejudiced him because the jury was permitted to "consider his prior felony as evidence of his guilt" and may have convicted him simply because it believed he was a bad person.

¶ 48    While counsel's choice of jury instructions is a matter of trial strategy, the failure to request a particular instruction may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission denied the right of the accused to a fair trial. *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16. In determining whether the failure to give an instruction deprived a defendant of a fair trial, we must look to all the circumstances, " 'including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors.' " *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 98 (quoting *People v. Layhew*, 139 Ill. 2d 476, 486 (1990)).

¶ 49    Evidence of other offenses is not admissible to establish a defendant's propensity to commit the offense charged. *People v. Park*, 245 Ill. App. 3d 994, 1002 (1993). Here, the evidence against defendant was sufficient but not overwhelming. The jury learned that defendant was a convicted felon and was informed by the trial court—without restriction—that it could consider that fact "for purposes of the case." Because counsel did not request IPI Criminal No. 3.13X, the jury was never apprised that it could only consider defendant's conviction with respect to the UPW charge.

¶ 50    The State argues that counsel's omission was trial strategy, particularly in light of the Committee Note to IPI Criminal No. 3.13X. That note provides that the instruction should be given only at the defendant's request if he or she does not testify at trial; otherwise, the instruction should not be given. IPI Criminal No. 3.13X, Committee Note (approved Oct. 17, 2014). The State contends that counsel "may have reasonably concluded" that requesting IPI Criminal No. 3.13X would have harmed the defense "by needlessly reminding the jury that defendant had a prior felony conviction." Thus, the State argues, counsel opted not to request the instruction to minimize the number of times the jury heard that defendant had a prior felony. However, we discern no basis in

the record to conclude that counsel's failure to request IPI Criminal No. 3.13X was in pursuit of such a strategy. Moreover, in a case such as this one, where the evidence against defendant was circumstantial and not overwhelming, we conclude that reasonable counsel would have recognized the importance of informing the jury that it could only consider defendant's status as a felon for a limited purpose. See *Park*, 245 Ill. App. 3d at 1002 (in close case, reasonable counsel would have asked for limiting instruction to impress upon jury importance of considering other crimes evidence only for limited purpose). While the jury was instructed not to consider "evidence that was received for a limited purpose *** for any other purpose," nothing informed the jury that defendant's prior felony conviction was received for a limited purpose. Accordingly, we conclude that counsel's failure to request IPI Criminal No. 3.13X was objectively unreasonable.

¶ 51    Defendant also argues that counsel's failure to object to Stien's testimony narrating the surveillance video (including testifying about the body types of the individuals, their gaits, and the rifle seen in one of the perpetrators' hands) and identifying defendant as one of the individuals therein constituted ineffective assistance. The State responds that counsel's performance was not deficient because any objection to Stien's testimony would be meritless. Specifically, the State claims that Stien's narration of the events in the video was properly based upon his perception of what the video showed. The State further argues that, by testifying only that defendant had a "very similar" body type to the heavyset individual in the video, Stien provided no improper lay opinion identification testimony.

¶ 52    A lay witness may only testify to events of which he has personal knowledge. Ill. R. Evid. 602 (eff. Jan. 1, 2011). "Testimony about the contents of a video recording by a witness with no firsthand knowledge of the events depicted is treated as the opinion testimony of a lay witness." *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 83. Lay opinion identification testimony is

admissible if "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *People v. Thompson*, 2016 IL 118667, ¶ 50; Ill. R. Evid. 701 (eff. Jan. 1, 2011). Such testimony is helpful "where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Thompson*, 2016 IL 118667, ¶ 50. A witness's opinion as to the contents of a video recording is "inadmissible if the jury is as capable as the witness of drawing inferences or conclusions from the recording." *Hampton*, 2021 IL App (5th) 170341, ¶ 83. "A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required." *Thompson*, 2016 IL 118667, ¶ 50. Instead, "the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Thompson*, 2016 IL 118667, ¶ 50. To determine whether lay opinion testimony is helpful, courts view the totality of the circumstances and consider

> "the witness's general familiarity with the defendant; the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted." *Thompson*, 2016 IL 118667, ¶ 51.

The absence of any particular factor does not render the testimony inadmissible, but the testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Thompson*, 2016 IL 118667, ¶¶ 51, 54.

¶ 53    Lay opinion identification testimony from a law enforcement officer is admissible. *Thompson*, 2016 IL 118667, ¶ 56. However, when the State seeks to introduce such testimony, the circuit court should engage in precautionary measures that safeguard the defendant's right to cross-examine the officer concerning his or her familiarity with the defendant and any bias without revealing to the jury the defendant's criminal record. *Thompson*, 2016 IL 118667, ¶ 59. The circuit court "should afford the defendant an opportunity to examine the officer outside the presence of the jury." *Thompson*, 2016 IL 118667, ¶ 59. Additionally, the court should instruct the jury before the testimony and in the final charge to the jury that it need not give any weight to the officer's testimony and that the jury is not to draw any adverse inference from the fact that the witness is a law enforcement officer. *Thompson*, 2016 IL 118667, ¶ 59.

¶ 54    Applying these principles, we hold that Stien's narration of the surveillance video and his identification testimony were improper. The State correctly notes that Stien's testimony detailing the events of the video was rationally based on his perception of what it showed. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 76 (while lay witness only observed surveillance video and did not personally observe the events depicted therein, testimony as to what the video depicted was nevertheless rationally based on witness's perception of the video). However, nothing in the record suggested that Stien was better equipped than the jury to discern the events depicted therein, identify the rifle held by one of the individuals, or observe the body types and gaits of the perpetrators. To the contrary, Stien himself testified that the rifle and the individuals' body types and gaits were "definitive things that *** you could see" in the video. See *Hampton*, 2021 IL App (5th) 170341, ¶ 86 (testimony that object in video did not look like gun was improper because it was not helpful to the jury; no evidence suggested witness was in a better position than the jury to reach conclusions or draw inferences from video); see also *King*, 2020 IL 123926, ¶ 38 (holding

witness's testimony inadmissible where he testified to numerous conclusions that ordinary jurors could easily draw for themselves). Accordingly, Stien's narration of the video was not helpful to the jury in interpreting the events depicted therein or in making a correct identification of defendant.

¶ 55    Contrary to the State's argument, Stien's testimony regarding defendant's body type was lay opinion identification testimony. Although Stien did not explicitly identify defendant as the heavyset individual in the surveillance video, he strongly insinuated as much by saying that defendant's body type was "very similar" to that individual's. See *Thompson*, 2016 IL 118667, ¶ 63 (officer's testimony that, *inter alia*, individual in video still "resembled" defendant was lay opinion identification testimony that required circuit court to engage in precautionary procedures required for law enforcement witnesses); *People v. Crawford*, 2021 IL App (5th) 170496, ¶¶ 51-52 (while witness never identified defendant in video as person "throwing up gang signs," his testimony "as a whole *** indicated as such"). As with Stien's narration testimony, we hold that his lay opinion identification testimony was not helpful to the jury in correctly identifying defendant. Stien observed defendant after having viewed the surveillance video and explicitly noted that, at the time of defendant's arrest, defendant wore different clothing than the individual in the video. Additionally, as previously noted, Stien admitted that the body types of the individuals in the video were readily apparent. Nothing suggests that Stien was in a better position to observe the heavyset individual in the video and draw conclusions based upon a comparison of that individual's body type to defendant's. By opining that defendant had a "very similar" body type to the heavyset individual in the video, Stien's lay opinion identifying defendant invaded the province of the jury and was improper. *People v. Brown*, 2017 IL App (1st) 142197, ¶ 64 (where record did not indicate how long detective reviewed recording to discern defendant or establish

that he was more likely than jury to identify defendant, detective's lay opinion identification testimony was improper). Moreover, Stien provided identification testimony without the trial court first engaging in any of the precautionary measures outlined in *Thompson* to safeguard defendant's right to confrontation. *Thompson*, 2016 IL 118667, ¶ 59; *Brown*, 2017 IL App (1st) 142197, ¶ 64. The State does not assert any particular trial strategy for counsel's failure to object to Stien's testimony, and we discern none from the record. Where defendant's identity as the perpetrator was at issue, we hold that counsel provided ineffective assistance in failing to object to Stien's improper lay opinion identification testimony.

¶ 56    Finally, defendant argues that counsel provided ineffective assistance in failing to object to the State's assertion, during rebuttal argument, that both defendant and one of the individuals in the surveillance video wore size 12 shoes.

¶ 57    Prosecutors generally have wide latitude in making a closing argument and may comment on the evidence and any fair, reasonable inferences it yields. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). However, it is improper for the prosecutor to argue assumptions or facts not based upon evidence in the case or to present to the jury what amounts to his own testimony. *People v. Smith*, 141 Ill. 2d 40, 60 (1990). A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and so prejudicial that real justice was denied or the verdict resulted from the error. *Jackson*, 2020 IL 124112, ¶ 83.

¶ 58    The State contends that an objection to its comment attributing a size 12 shoe size to both defendant and the heavyset individual in the video would have been meritless because, although no direct evidence established any particular shoe size, the remark was a fair comment on the consistency of the appearance of both individuals' shoes. The State further asserts that, in any

event, any error resulting from its comment was cured because the jury instructions included an admonishment that closing arguments are not evidence. These arguments are unavailing.

¶ 59    "Instructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by the introduction of such evidence." *People v. Blue*, 189 Ill. 2d 99, 132 (2000); *People v. Wheeler*, 226 Ill. 2d 92, 130 (2007). Whether a remark constitutes error depends on the nature and extent of the statements and whether they are probative of defendant's guilt. *Blue*, 189 Ill. 2d 99, 132 (2000). Under the circumstances of this case, we hold that the State's remark was improper. During closing argument, the State asserted that defendant could be placed at 161 Broadway because he was linked to the heavyset individual in the surveillance video. However, to establish that link, the State not only relied on Stien's improper lay opinion identification testimony, but it also injected speculative evidence that the shoes in the video were size 12, like defendant's. No such evidence was presented to support that assertion. The State does not contend that counsel's failure to object to this comment was premised upon any trial strategy, and we have identified no strategic motive for counsel's lack of objection in the record. Instead, we hold that reasonable counsel would have objected to the State's improper comment, particularly where the State's ability to link defendant to the heavyset individual in the surveillance video was key to establishing his presence at 161 Broadway. Counsel's failure to do so was objectively unreasonable.

¶ 60    We further hold that defendant suffered prejudice as a result of counsel's errors. The evidence of defendant's guilt was not overwhelming. Defendant's involvement in the crimes at 161 Broadway was substantially premised upon (1) his purported appearance in the surveillance video and (2) his being located at 510 North Day, where items used in the shooting were found. Had counsel objected to Stien's improper identification testimony and to the State's impermissible

comment during its rebuttal argument, which was particularly prejudicial since defendant had no opportunity to respond, the jury would be left, primarily, with defendant's presence at 510 North Day to connect him to the offenses. See *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 110 (misstating evidence in rebuttal is particularly damaging since defendant has no opportunity to respond). However, suspicious conduct or probabilities alone cannot "substitute for proof," and the "mere presence of defendant at the scene of the crime is not itself sufficient to sustain a conviction." *People v. Jakes*, 207 Ill. App. 3d 762, 770 (1990). On top of that, because counsel failed to request a limiting instruction regarding defendant's felon status, there is the distinct possibility that the jury convicted defendant because it believed he had a "propensity to commit crime" or because it "fe[lt] that defendant is a bad person who deserves punishment." *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998). But for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. See *People v. Lewis*, 2020 IL App (2d) 170900, ¶ 59 (prejudice established where cumulative effect of counsel's deficient performance rendered proceeding unreliable under *Strickland*). We hold that defendant has established ineffective assistance of counsel. Because we determined that the evidence was sufficient for a rational trier of fact to have found defendant guilty of the charged offenses, there is no double jeopardy impediment for a new trial. Accordingly, we reverse and remand the matter for a new trial.

¶ 61                                     III. CONCLUSION

¶ 62    For the reasons stated, we reverse the judgment of the circuit court of Winnebago County and remand for a new trial.

¶ 63    Reversed and remanded.